**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HRI HOLDING CORP., *et al.*[1] | Case No. 19-12415 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF MATTHEW R. MANNING IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Matthew R. Manning, hereby declare as follows:

1. I am the Chief Restructuring Officer of HRI Holding Corp. and its affiliated debtors and debtors-in-possession (collectively, "Houlihan's, the "Company" or the "Debtors"). I joined the Company's management team as its Chief Restructuring Officer (the "CRO") in June 2019. In this capacity, I have become and am familiar with the Debtors' businesses, day-to-day operations and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") and filed various motions described herein

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HRI Holding Corp. (4677), Houlihan's Restaurants, Inc. (8489), HDJG Corp. (3479), Red Steer, Inc. (2214), Sam Wilson's/Kansas, Inc. (5739), Darryl's of St. Louis County, Inc. (7177), Darryl's of Overland Park, Inc. (3015), Houlihan's of Ohio, Inc. (6410), HRI O'Fallon, Inc. (4539), Algonquin Houlihan's Restaurant, L.L.C. (0449), Geneva Houlihan's Restaurant, L.L.C. (3156), Hanley Station Houlihan's Restaurant, LLC (4948), Houlihan's Texas Holdings, Inc. (5485), Houlihan's Restaurants of Texas, Inc. (4948), JGIL Mill OP LLC (0741), JGIL Millburn, LLC (6071), JGIL Milburn Op LLC (N/A), JGIL, LLC (5485), JGIL Holding Corp. (N/A), JGIL Omaha, LLC (5485), HOP NJ NY, LLC (1106), HOP Farmingdale LLC (7273), HOP Cherry Hill LLC (5012), HOP Paramus LLC (5154), HOP Lawrenceville LLC (5239), HOP Brick LLC (4416), HOP Secaucus LLC (5946), HOP Heights LLC (6017), HOP Bayonne LLC (7185), HOP Fairfield LLC (8068), HOP Ramsey LLC (8657), HOP Bridgewater LLC (1005), HOP Parsippany LLC (1520), HOP Westbury LLC (2352), HOP Weehawken LLC (2571), HOP New Brunswick LLC (2637), HOP Holmdel LLC (2638), HOP Woodbridge LLC (8965), and Houlihan's of Chesterfield, Inc. (5073). The Debtors' corporate headquarters and the mailing address is 8700 State Line Road, Suite 100, Leawood, Kansas 66206.

requesting certain relief in connection with the Chapter 11 Cases (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (a) my personal knowledge gained in my capacity as an officer of the Company, (b) information supplied to me by employees under my supervision or members of the Company's management team, (c) my review of relevant documents, and/or (d) my experience and knowledge of the Company's operations and financial affairs. I am authorized by the Debtors to submit this Declaration and, if called upon to testify, I could and would testify to the facts set forth herein.

4. Part I of this Declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these Chapter 11 Cases, Part III describes the Debtors' proposed course for these Chapter 11 Cases, and Part IV sets forth certain facts in support of the First Day Pleadings.

## I.

## OVERVIEW OF THE DEBTORS' BUSINESSES

**Business Operations**

5. Formed in September 1992 under the name "Gilbert/Robinson, Inc.," and headquartered in Leawood, Kansas, the Company today owns and operates forty-seven (47) restaurants in fourteen (14) states (Connecticut, Florida, Illinois, Indiana, Kansas, Michigan, Missouri, Nebraska, New Jersey, New York, Ohio, Pennsylvania, Texas, and Virginia) as depicted below.





6. The Company's thirty-four (34) Houlihan's Restaurant + Bar (a/k/a Houlihan's) restaurants are leaders in the "polished casual" dining space, offering a unique, made from scratch menu and energetic bar scene; its six (6) J. Gilbert's Wood-Fired Steak + Seafood (a/k/a J. Gilbert's) restaurants offer a modern twist on the classic American steakhouse, crafting high-quality, wood-fired steaks in an upscale yet rustic and warm environment; its six (6) seafood restaurants (three (3) Bristol Seafood Grill ("Bristol") and three (3) Devon Seafood Grill ("Devon")) feature high quality ocean fare delivered with simplicity in an elegant, approachable fine dining setting; and its newest concept, Make Room for Truman, offers classic, time-honored recipes prepared with modern techniques, served in an authentic atmosphere. The Company also has twenty-three (23)





franchised locations, twenty-one (21) Houlihan's and two (2) Bristol and Devon, in California, Georgia, Illinois, Indiana, Iowa, Kansas, Maryland, Minnesota, Missouri, Pennsylvania, Texas, and Virginia.

7.      Through its Company-owned and franchised locations, Houlihan's has pursued a strategy of growth and development by concentrating on local markets. Across its portfolio, Houlihan's has focused on consistency of brand image, serving top quality food and beverages with honest, Midwestern hospitality.

8.      As of the Petition Date, the Debtors have approximately 3,450 salaried and hourly employees, the vast majority of whom work in the Company's restaurants and are employed by, and on the payroll of debtor Houlihan's Restaurant's, Inc. ("HRI"). The Company has no unionized employees and is not party to any collective bargaining agreements. On a consolidated basis, the Debtors reported $202 million in revenues for fiscal year 2019 and generated EBITDA of $9.0 million (before nonrecurring expenses) for that same period.

**Corporate Structure**

9.      The Company's organizational structure as of the Petition Date is set forth on **Exhibit A** attached hereto (the "Organizational Chart") and includes thirty-nine (39) separate entities that ultimately are 93.4% owned by certain affiliates of York Capital Management (such affiliates, collectively, the "Sponsor").[2]  HRI Holding Corp. ("HRI Holding"), a Delaware corporation that is the lead Debtor in these Chapter 11 Cases, is the 100% shareholder of HRI, a Delaware corporation that is the 100% owner of the Debtors' other operating and non-operating

---

[2] The Sponsor holds 93.4% of the equity in HDJG Corp. ("HDJG"), a holding company that owns 100% of HRI Holdings. The balance (6.6%) of HDJG's equity is held by (i) 23 individuals who in the aggregate own 3.1% of the equity of HDJG and (ii) Michael Archer, the Company's Chief Executive Officer and a member of the board, along with two (2) independent directors, of HDJG at 3.5%. Mr. Archer also is the sole director of all the other Company/Debtor entities.

subsidiaries.[3] HRI is the Debtors' main operating entity, employing and paying substantially all of the Debtors' employees, contracting with vendors and operating the Debtor's owned restaurants.

**Capital Structure**

10. As of the Petition Date, the Debtors have assets totaling approximately $79.8 million (exclusive of goodwill) and consolidated outstanding liabilities totaling approximately $76.9 million, consisting primarily of secured and unsecured obligations described further below.

*Secured Debt*

11. HRI Holding and HRI and certain other Debtor borrowers and guarantors are parties to that certain Credit and Guaranty Agreement dated December 17, 2015 (as subsequently amended or modified, the "Credit Agreement") with CIT Bank, N.A. as Administrative Agent (the "Agent") and the lender parties thereto (collectively, the "Lenders"), pursuant to which the Lenders made certain revolving loans, term loans and financial accommodations available to the Debtors. The Credit Agreement provided for a term loan commitment of $42,171,000 (the "Term Loan"), a revolving credit commitment of up to $3,000,000 (the "Revolving Loan") and a delayed-draw term loan commitment of $7,500,000 (the "Delayed-Draw Term Loan" and, together with the Revolving Loan and the Term Loan, the "Loans"). The Credit Agreement also provided for the issuance of certain standby and commercial letters of credit in an aggregate undrawn face amount of up to $2,500,000. Prior to the Petition Date, standby letters of credit were issued in the aggregate amount of approximately $2,230,000 (the "Standby Letters of Credit"). The obligations under the Credit Facility are secured by first priority liens on generally

---

[3] HRI also owns a 30% interest in Winghaven Restaurant Partners, LLC ("WRP") a non-debtor entity. Pursuant to that certain Management Agreement dated October 31, 2003 by and between WRP and HRI, HRI supervises and directs the management and operation of the restaurant owned by WRP (the "WRP Restaurant") and all personnel of the WRP Restaurant are employees or independent contracts of HRI.

all of the Debtors' assets, as set forth in certain Collateral Documents (as defined in the Credit Agreement). The maturity date on the Loans is December 17, 2020. As of the Petition Date, the total outstanding balance under the Loans was approximately $42,319,000 plus accrued and unpaid interest with respect to the Loans of approximately $4,631,000 as of the Petition Date.

*Unsecured Debt*

12.     As of the Petition Date, the Debtors estimate that their unsecured debt aggregates approximately $30.7 million, consisting of trade debt in the approximate amount of $8.2 million and other liabilities in the approximate amount of $22.5 million.

*Equity*

13.     As set forth on the Organizational Chart, HRI directly or indirectly owns or controls 100% of the equity in the majority of the Debtors' affiliates and subsidiaries. HRI is 100% owned by HRI Holding, which is 100% owned by HDJG, which is 93.4% owned by the Sponsor.

## II.

## EVENTS LEADING TO THESE CHAPTER 11 CASES

14.     Since its formation in 1992, the Company has enjoyed a long history of innovation and on trend food and beverages served with honest, Midwestern hospitality. In December 2015, the Sponsor and certain company employees made significant investments in the Company and its subsidiaries based upon a strategic growth vision focused on the development of the J. Gilbert's brand and the potential acquisition of the largest Houlihan's franchisee. Various industry headwinds, senior management changes and shifts in investment philosophy eventually left the Company without the funds needed to grow their businesses and absorb the costs associated with the shifting labor market, unfavorable leases, and the rapid growth in costly third-party delivery. Additionally, in May 2018, the Company acquired seventeen (17) Houlihan's restaurants from A.C.E. Restaurant Group, Inc., which at

the time was the Company's single largest franchisee. The premise of the acquisition was to bring the units in-house and refresh certain of the locations, but the Company's liquidity constraints prevented that work from being accomplished. Consequently, and although these units continue to be strong performers (particularly in guest satisfaction metrics, where they out-perform the casual dining sector's average), this "bolt-on" acquisition has not yet achieved its potential.

15.     In an attempt to remedy this situation, senior management has evaluated the Company's business, closed underperforming locations and streamlined their management and support center team. Management also has evaluated and elevated its marketing and promotions, reinvented the Houlihan's menu, reinvigorated happy hour, developed the Make Room for Truman's prototype, and created programs and processes to attract, train and retain top management talent for its restaurants and support teams. As a result of both senior management's and the Company's field teams' efforts, the Company's owned restaurants have experienced both same store sales and traffic growth above that of the industry average in the past year.

16.     Notwithstanding these industry-leading results and the cost containment and reduction measures management has undertaken, the Debtors' capital and debt structure, combined with its limited liquidity, has severely constrained growth and jeopardized the Debtors' ability to fund current operations. The Debtors have not paid any interest or debt service to the holders of their Loans since December 2018, and certain of their rent obligations and other vendor payments are past due. The Company has been challenged by unsustainably high occupancy costs at many of its locations, accounting for approximately $3.5 million of annual EBITDA losses. Prior to the filing of these Chapter 11 Cases, and after unsuccessful negotiations with certain landlords regarding rent and other lease concessions, the Company closed twelve (12) of its unprofitable restaurants.

17. As a result of certain alleged defaults under the Credit Agreement as asserted by the Agent in March and April of 2019, and the Company's disputes with respect thereto, the Company, the Lenders and the Sponsor entered into that certain Forbearance and Sale Support Agreement dated June 21, 2019 (as subsequently amended or modified, the "FSSA"). Pursuant to the FSSA, the Lenders agreed (among other things) to forbear from exercising remedies and the Company agreed (among other things) to engage an investment banker to commence a sale process in connection with the potential sale of all or substantially all of the Company's capital stock, assets and/or businesses during the Forbearance Period (the "Sale Process") which, absent extension, would expire on November 15, 2019. In connection with the FSSA, the Sponsor's board members and officers resigned from all of their positions, two (2) independent directors were nominated and appointed to the board of HDJG (the Debtors' ultimate holding company), I was engaged as CRO, and the existing executive and management teams continued day-to-day operation of the Company's businesses.

18. Ultimately, following its evaluation of all available options, the Company determined that filing for Chapter 11 protection, obtaining postpetition financing and pursuing an orderly sale of its assets in a controlled, court-supervised environment is the best available option to maximize value for the Company and its stakeholders. The Debtors believe that the Chapter 11 process, including the proposed sale of substantially all of their assets to the Stalking Horse Bidder (defined below) subject to higher or otherwise better bids pursuant to Bankruptcy Code section 363 (the "Sale"), will be seamless for its customers, trading partners and vendors, result in minimal disruption to its operations, allow the Company to strengthen its financial structure, and position it for significant future growth.

**363 Sale and DIP Facility**

19.     In June 2019, the Company engaged Piper Jaffray & Co. ("PJC") in connection with the Sale Process.  PJC prepared extensive marketing materials and began marketing the Company in August 2019.

20.     After receiving and evaluating various proposals and conducting numerous management meetings with interested parties, the Company selected Landry's, LLC as the stalking horse purchaser (the "Stalking Horse Bidder") in connection with the Sale.  On November 13, 2019, the Company and the Stalking Horse Bidder entered into an asset purchase agreement (the "Asset Purchase Agreement"), a true and correct copy of which is attached to the Debtors' Sale Motion (as defined below).  The Stalking Horse Bidder has agreed to purchase substantially all of the Debtors' assets, subject to higher or otherwise better bids, for aggregate consideration of $40.0 million in cash, subject to certain adjustments, and the assumption of certain liabilities.  The Stalking Horse Bidder presently intends to offer employment to many of the Company's operational and certain other employees with employment commencing upon the closing of the Sale.

21.     The Debtors believe, in the exercise of their business judgment, that the proposed Sale and auction structure will foster an open and competitive process and provide the best option to maximize value for all of their stakeholders.  Indeed, given that the Debtors have limited cash and no realistic financing option other than the DIP Facility (described below, which itself depends on the Sale process moving forward as proposed), the only alternative to the Sale would be conversion to Chapter 7 and liquidation.  In the Debtors' view, liquidation would be exceedingly value destructive, as the Debtors would immediately lose their going concern value,

thousands of jobs would be eliminated and assets that have little or no value outside of their use by the Company as a going concern would be monetized for marginal amounts.

22. In order to ensure that they have sufficient funds to maintain the stability of their businesses and their going concern value, the Debtors have obtained authority to borrow approximately $5 million from the Lenders and utilize their cash collateral during the Chapter 11 Cases (the "DIP Facility"), as set forth in the DIP Motion (defined below). In the exercise of their business judgment, the Debtors have determined that the DIP Facility is the best, and only, financing available to them and that the DIP Facility will provide them with the liquidity they require to operate in these Chapter 11 Cases.

### III.

### PROPOSED COURSE OF THE CHAPTER 11 CASES

23. The Debtors intend to pursue the Sale in Chapter 11 in order to avoid deterioration of their businesses and obtain maximum value for their assets for the benefit of all of their stakeholders, including their employees and creditors. The DIP Facility will provide the Debtors with sufficient liquidity to operate during the Sale process and the Stalking Horse Bid sets a floor price for what the Debtors hope will be an open, competitive and ultimately successful auction.

24. In order to achieve their goals in Chapter 11, the Debtors seek the relief set forth in the First Day Motions, as summarized below.

### IV.

### FACTS IN SUPPORT OF FIRST DAY PLEADINGS[4]

25. To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve

---

[4] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

and maximize the value of the Debtors' estates, the Debtors have filed the following First Day Motions:

- Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;

- Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Petition Date;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the United States Trustee Operating Guidelines;

- Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Tax and Fee Obligations and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of the Debtors for Interim and Final Orders Authorizing the Debtors to (I) Maintain Existing Insurance Policies and Pay All Policy Premiums Arising Thereunder and Renew or Enter into New Policies and (II) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Premium Financing Arrangements;

- Motion of the Debtors for Entry of Interim and Final Orders (a) Authorizing the Debtors to Pay All or a Portion of the Prepetition Claims of Certain Critical Vendors and (b) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business;

{1247.001-W0058580.7}                           11

- Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a)(2), 541, 1107(a), and 1108 (I) Authorizing the Payment of Prepetition Claims Arising Under (A) the Perishable Agricultural Commodities Act and (B) the Packers and Stockyards Act and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related to the Foregoing;

- Motion of the Debtors for Entry of an Order (A) Approving Bidding Procedures in Connection with a Transaction by Public Auction; (B) Scheduling a Hearing to Consider the Transaction; (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Procedures, and (E) Granting Related Relief ("Bid Procedures Motion");

- Motion of the Debtors for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Claims and Liens, (III) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief ("Sale Motion");

- Motion of the Debtors and Debtors-In-Possession for Interim and Final Orders Authorizing the Debtors to: (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Relief to Prepetition Secured Lenders ("DIP Motion");

- Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to (a) Reject Certain Unexpired Leases *Nunc Pro Tunc* to the Petition Date and (b) Abandon Any Remaining Property at the Rejected Locations and (II) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases;

- Application of the Debtors to Approve the Employment and Retention of Landis Rath & Cobb LLP as Counsel, *Nunc Pro Tunc* to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rules 2014 and 2016 and Local Rule 2014-1;

- Debtors' Application for an Order Authorizing Retention and Employment of M-III Advisory Partners, LP as Financial Advisors to the Debtors, *Nunc Pro Tunc* to the Petition Date;

- Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Piper Jaffray & Co. as the Debtors' Investment Banker and Exclusive Agent for the Proposed Transaction, Effective as of the Petition Date, and (II) Waiving Certain Information Requirements Pursuant to Local Rule 2016-2;

- Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Hilco Real Estate, LLC, as Real Estate Advisor to the Debtors, *Nunc Pro Tunc* to the Petition Date and a Waiver of Compliance with Certain of the Requirements of Local Rule 2016-2; and

- Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Administrative Advisor Effective *Nunc Pro Tunc* to the Petition Date.

26. I have reviewed each of the First Day Motions, including any exhibits thereto, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I hereby incorporate by reference each of the factual statements set forth in the First Day Motions. These First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and authority to use cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

27. Several of these motions request authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty (20) days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

28. In sum, I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; (c) is necessary to avoid immediate and irreparable harm; and (d) best serves the interests of the Debtors' stakeholders.

## DECLARATION

29. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**RELIEF REQUESTED**

30. I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

Dated: November 14, 2019

HRI Holding Corp.
Houlihan's Restaurants, Inc.
HDJG Corp.
Red Steer, Inc.
Sam Wilson's/Kansas, Inc.
Darryl's of St. Louis County, Inc.
Darryl's of Overland Park, Inc.
Houlihan's of Ohio, Inc.
HRI O'Fallon, Inc.
Algonquin Houlihan's Restaurant, L.L.C.
Geneva Houlihan's Restaurant, L.L.C.
Hanley Station Houlihan's Restaurant, LLC
Houlihan's Texas Holdings, Inc.
Houlihan's Restaurants of Texas, Inc.
JGIL Mill OP LLC
JGIL Millburn, LLC
JGIL Milburn Op LLC
JGIL, LLC
JGIL Holding Corp.
JGIL Omaha, LLC
HOP NJ NY, LLC
HOP Farmingdale LLC
HOP Cherry Hill LLC,
HOP Paramus LLC
HOP Lawrenceville LLC
HOP Brick LLC
HOP Secaucus LLC
HOP Heights LLC
HOP Bayonne LLC
HOP Fairfield LLC
HOP Ramsey LLC
HOP Bridgewater LLC
HOP Parsippany LLC
HOP Westbury LLC
HOP Weehawken LLC
HOP New Brunswick LLC
HOP Holmdel LLC
HOP Woodbridge LLC
Houlihan's of Chesterfield, Inc.

_____
Matthew R. Manning
Chief Restructuring Officer