## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

HRI HOLDING CORP., *et al.*[1]

Debtors.

Chapter 11

Case No. 19-12415 (___)

(Joint Administration Requested)

## MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO POST-PETITION LENDERS AND (C) UTILIZE CASH COLLATERAL, (II) PROVIDING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363, 364 AND 507, AND (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

The above-captioned debtors and debtors-in-possession (the "Debtors") by and through their proposed undersigned counsel, hereby file this motion (the "Motion") for the entry of an interim order substantially in the form of the proposed order annexed hereto (the "Interim Order")[2] and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") authorizing the Debtors, pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), including sections 105, 361, 362,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HRI Holding Corp. (4677), Houlihan's Restaurants, Inc. (8489), HDJG Corp. (3479), Red Steer, Inc. (2214), Sam Wilson's/Kansas, Inc. (5739), Darryl's of St. Louis County, Inc. (7177), Darryl's of Overland Park, Inc. (3015), Houlihan's of Ohio, Inc. (6410), HRI O'Fallon, Inc. (4539), Algonquin Houlihan's Restaurant, L.L.C. (0449), Geneva Houlihan's Restaurant, L.L.C. (3156), Hanley Station Houlihan's Restaurant, LLC (4948), Houlihan's Texas Holdings, Inc. (5485), Houlihan's Restaurants of Texas, Inc. (4948), JGIL Mill OP LLC (0741), JGIL Millburn, LLC (6071), JGIL Milburn Op LLC (N/A), JGIL, LLC (5485), JGIL Holding Corp. (N/A), JGIL Omaha, LLC (5485), HOP NJ NY, LLC (1106), HOP Farmingdale LLC (7273), HOP Cherry Hill LLC (5012), HOP Paramus LLC (5154), HOP Lawrenceville LLC (5239), HOP Brick LLC (4416), HOP Secaucus LLC (5946), HOP Heights LLC (6017), HOP Bayonne LLC (7185), HOP Fairfield LLC (8068), HOP Ramsey LLC (8657), HOP Bridgewater LLC (1005), HOP Parsippany LLC (1520), HOP Westbury LLC (2352), HOP Weehawken LLC (2571), HOP New Brunswick LLC (2637), HOP Holmdel LLC (2638), HOP Woodbridge LLC (8965), and Houlihan's of Chesterfield, Inc. (5073). The Debtors' corporate headquarters and the mailing address is 8700 State Line Road, Suite 100, Leawood, Kansas 66206.

[2] Capitalized terms used herein and not otherwise defined herein have the meanings given to them in the Interim Order and the DIP Credit Agreement, as applicable.

363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507(b) thereof, and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including rules 2002, 4001, 6004 and 9014, to: (i) obtain postpetition loans, advances and other financial accommodations (the "Postpetition Financing") pursuant to and in accordance with the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as it may be amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Credit Agreement"), substantially in the form annexed to the Interim Order as **Exhibit 1**, by and among the Debtors, as borrowers, CIT Bank, National Association, in its capacity as administrative agent and collateral agent, (in such capacity, "DIP Agent") and the financial institutions from time to time party thereto, as lenders, (collectively, including any financial institution that may issue letters of credit on behalf of any Debtor, "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties"); (ii) grant Liens and superpriority administrative expense claims to Post-Petition Lenders; (iii) utilize cash collateral, (iv) provide adequate protection to the Pre-Petition Secured Parties; (v) modify the automatic stay, (vi) grating related relief, and (vii) scheduling a final hearing on the Motion ("Final Hearing"). In support of the Motion, the Debtors rely on the *Declaration of Matthew R. Manning in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and the *Declaration of Jean E. Hosty in Support of the Motion of the Debtors and Debtors-in-Possession for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders and (C) Utilize Cash Collateral, (II) Providing Adequate Protection to the Pre-Petition Secured Parties, (III) Modifying The Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2* (the

"Hosty Declaration" and together with the First Day Declaration, the "Declarations"). In further support of this Motion, the Debtors submit as follows:

## PRELIMINARY STATEMENT

The Debtors have secured a debtors-in-possession credit facility in a maximum principal amount of up to $5,000,000 through the earlier of (i) the closing of a sale approved by the Court and (ii) January 31, 2020. To continue operating in the ordinary course while formulating and seeking approval of the terms of a sale of substantially all of the Debtors' assets pursuant to Bankruptcy Code section 363 during this period, the Debtors need to access liquidity. The Debtors will obtain this liquidity from the use of cash collateral and the DIP Facility. However, the use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs and provide appropriate assurances to customers, vendors and employees during this period. In fact, without the DIP Facility, the Debtors would not be able to operate at all for more than a few days into these Chapter 11 Cases. Therefore, additional financing is necessary to maintain the value of the Debtors' businesses and, ultimately, effectuate a successful sale and reorganization process.

As discussed below and in the Hosty Declaration, the Debtors' decision to proceed with the DIP Facility comes after a dedicated and diligent search for other and better financing alternatives. The DIP Facility is the best, and likely the only, available source of financing and provides the Debtors with the liquidity they need to operate during these Chapter 11 Cases. The DIP Facility was negotiated at arm's length on terms that are reasonable. Thus, to ensure the Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, the DIP Facility should be approved. Such approval is requested on an interim basis for funding up to $3,200,000 (the "Interim DIP Amount"), which the Debtors require over

the next several weeks, and on a final basis for funding up to a total of $5,000,000 required to operate through the expected conclusion of the proposed sale process.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).[3]

2.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 4001-2 and 9013-1.

## BACKGROUND

**A.      General Background**

3.      On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[3] Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors hereby confirm their consent to entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

6.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in detail in the Declarations filed contemporaneously with this Motion and incorporated herein by reference.

**B.      The Debtors' Liquidity Needs**

*The Prepetition Obligations*

7.      Prior to the Petition Date, the Pre-Petition Secured Parties made loans, advances and provided other financial accommodations to certain of the Debtors pursuant that certain Credit and Guaranty Agreement dated as of December 17, 2015 (the "Pre-Petition Credit Agreement"), among (1) HDJG Merger Corp., (2) HRI Holding Corp., (3) Houlihan's Restaurants, Inc., and the other Borrowers (as defined in the Pre-Petition Credit Agreement) thereto, (4) HDJG Corp. and the other Guarantors (as defined in the Pre-Petition Credit Agreement), (5) the Lenders (as defined in the Pre-Petition Credit Agreement) from time to time party thereto, and (6) CIT Bank, N.A. (the "Pre-Petition Agent"), as Administrative Agent (as amended or modified, the "Pre-Petition Credit Agreement").

8.      As of the Petition Date, the aggregate amount of all Obligations (as defined in the Pre-Petition Credit Agreement) owing by Pre-Petition Borrowers to the Pre-Petition Secured Parties under and in connection with the Pre-Petition Financing Documents was not less than (a) $44,583,642, plus interest accrued and accruing thereon at the rate in effect on the Petition Date, including (b) outstanding letters of credit in the aggregate amount of $1,824,569, plus (c) accrued and accruing fees, plus (d) all accrued and accruing costs and expenses (including

attorneys' fees and legal expenses), plus (e) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Pre-Petition Credit Agreement (collectively, "Pre-Petition Obligations").

9.      The Pre-Petition Obligations were secured pursuant to the Pre-Petition Financing Documents by valid, binding, perfected, enforceable and non-avoidable first priority security interests and liens ("Pre-Petition Credit Liens") granted by Borrower to the Pre-Petition Agent, for the benefit of itself and the Pre-Petition Lenders, upon the Collateral (hereafter "Pre-Petition Collateral"), subject only to any valid, perfected and unavoidable lien or security interest otherwise existing as of the Petition Date, which are acknowledged to be senior in priority under the Pre-Petition Credit Agreement (collectively, "Prior Permitted Liens" and each a "Prior Permitted Lien").

10.      The purpose of these Chapter 11 Cases, which have been consented to by each of the Pre-Petition Secured Parties and the Pre-Petition Agent, is to conduct a sale of the Debtors' assets. The DIP Facility and the sale process will accomplish this goal.

*Debtors' Liquidity*

11.      The Debtors do not currently have sufficient available cash.  Based on expected receipts and disbursements in the ordinary course of business, the Debtors' cash balance will, absent new financing, drop to near or below zero within a few days.  Accordingly, the use of Cash Collateral alone will not be sufficient to fund these Chapter 11 Cases through a sale process.  Without additional cash resources being made immediately available, the Debtors will be unable to provide comfort to their customers, vendors and employees that might otherwise discontinue business with the Debtors during the proposed sale process.

12.    Accordingly, a critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses and consummate an orderly sale of their assets. The Debtors are unable to obtain the required funds (i) in the forms of (x) unsecured credit or debt allowable under Bankruptcy Code section 503(b)(1), (y) an administrative expense pursuant to Bankruptcy Code sections 364(a) or (b), (z) unsecured debt having the priority afforded by Bankruptcy Code section 364(c)(l) or (w) debt secured only as described in Bankruptcy Code sections 364(c)(2) or (3); or (ii) on terms more favorable than those offered by the DIP Lender.

13.    The Debtors have requested that, pursuant to the terms of the DIP Financing Documents, the Prepetition Secured Lenders permit the use of Cash Collateral and the DIP Lenders make loans and advances and provide other financial accommodations to the Debtors (in the amount set forth in the Interim Order in the first instance, on an interim basis, and for the balance of the DIP Facility, on a final basis). The ability of the Debtors to continue to operate their businesses through their proposed sale process, and indeed in the very immediate future, depends on the Debtors obtaining this financing. The DIP Lenders are only willing to make these loans and advances and provide other financial accommodations on a priming secured and superpriority administrative basis, as more particularly described herein.

14.    Accordingly, the relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties through the proposed sale process, and is in the best interests of the Debtors, their estates and creditors.

15.    The terms of the DIP Facility have been negotiated at arm's length and in "good faith," as that term is used in Bankruptcy Code section 364(e), and are in the best interests of the Debtors, their estates and creditors. The DIP Lenders are extending financing to the Debtors in

good faith, and the DIP Lenders are entitled to the benefits of the provisions of Bankruptcy Code section 364(e).

16.    The relief requested by this Motion is necessary to avoid harm to the Debtors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of the Interim Order. The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable under the facts and circumstances of these Chapter 11 Cases, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

**C.    The Debtors' Efforts to Obtain DIP Financing**

17.    The Debtors have been unable to obtain the required funds in the forms of (i) unsecured credit or debt allowable under Bankruptcy Code section 503(b)(1), (ii) an administrative expense pursuant to Bankruptcy Code sections 364(a) or (b), (iii) unsecured debt having the priority afforded by Bankruptcy Code section 364(c)(l) or (iv) debt secured only as described in Bankruptcy Code sections 364(c)(2) or (3).

18.    It is unlikely that any other lender would provide financing to the Debtors at this stage. The DIP Facility is a strictly limited loan for a very short duration (78 days at most) intended to provide the Debtors with the minimal cash needed to proceed with their proposed asset sale. Based on the Investment Banker's (as hereinafter defined) experience with numerous similar financings, absent the Prepetition Secured Parties' consent to be primed, the Debtors are unable to secure alternative financing. Accordingly, it is not surprising that the DIP Lenders are not only the best source of postpetition financing, but the only source of postpetition financing for the Debtors. Further, the terms and conditions of the DIP Facility are well within the range of commercial reasonableness.

**D.     DIP Financing Documents and DIP Obligations**

19.     To the extent requested by the DIP Lenders, the Debtors may enter into and deliver the DIP Financing Documents, including such additional documents, instruments, notes, and agreements that are consistent with the terms of the DIP Orders as may be reasonably required by the DIP Lenders to implement the terms or effectuate the purposes of the DIP Orders.

**E.     Development of the Budget**

20.     The budget for the Debtors' receipts and disbursements during these Chapter 11 Cases (the "DIP Budget") is attached to the Interim Order as **Exhibit 2**.  To best assess the Debtors' funding needs during these Chapter 11 Cases, the Debtors have analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful sale (to close on or before December 31, 2019) and reorganization.  In undertaking this analysis, the Debtors and their advisors have considered the Debtors' near-term projected financial performance, including trends in the Debtors' industry and the cost to better optimize the Debtors' operations.

21.     As part of the Debtors' financial review and analysis, the Debtors developed a cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected 7 week sale period.  This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations, and the cost of necessary services and maintenance and includes all of the expenditures for which the Debtors seek authority to pay in various "First-Day" pleadings.

22.     Utilizing this cash flow forecast to project its cash needs during these Chapter 11 Cases, the Debtors believe that the proposed DIP Facility will provide the Debtors with sufficient liquidity to fund their operations during the early stages of these Chapter 11 Cases, through the projected sale closing date, with an agreed minimum cash balance as set forth in the DIP Budget. The immediate availability of the DIP Facility, in the Interim Order Amount on an interim basis, is necessary to provide assurance of payment and "business as usual" continued operations to customers, vendors and employees.  Without such assurances, vendors may very well refuse to provide goods and services to the Debtors and/or require cumbersome credit terms, which could negatively affect the Debtors' sale and reorganization efforts and the Debtors' bankruptcy estates as a whole.  Further, customers may take their business elsewhere, and employees—one of the Debtors' most crucial assets—may seek alternative employment.  As described above and as set forth in the DIP Budget, the Debtors' use of Cash Collateral will be insufficient in itself to carry the Debtors through the proposed sale process.

23.     The Debtors (in consultation with their advisors) have determined that (i) the DIP Budget is reasonable and will allow the Debtors to operate in these Chapter 11 Cases and (ii) the DIP Budget includes all reasonable, necessary and foreseeable expenses to be incurred for the period set forth in the DIP Budget through the proposed sale period.  To be clear, the DIP Budget depends on an asset sale on terms equal or better to those proposed in the stalking horse bid.  The DIP Facility will finance the Debtors through the anticipated sale closing date.

**F.     Concise Statement Pursuant to Bankruptcy Rule 4001(b) and (c)**

24.     Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors submit this concise statement of the material terms of the DIP Facility, as specified in the Interim Order.[4]

---

[4] The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with

| Provision | Summary Description |
|---|---|
| **Facility Structure**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Revolving advance loan facility<br><br>*See* DIP Credit Agreement § 2.01(a) |
| **Borrower**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | HRI HOLDING CORP., HOULIHAN'S RESTAURANTS, INC., RED STEER, INC., SAM WILSON'S/KANSAS, INC., DARRYL'S OF ST. LOUIS COUNTY, INC., DARRYL'S OF OVERLAND PARK, INC., HOULIHAN'S OF CHESTERFIELD, INC., HOULIHAN'S OF OHIO, INC., HRI O'FALLON, INC., ALGONQUIN HOULIHAN'S RESTAURANT, L.L.C., GENEVA HOULIHAN'S RESTAURANT, L.L.C., HANLEY STATION HOULIHAN'S RESTAURANT, LLC, HOULIHAN'S TEXAS HOLDINGS, INC., and HOULIHAN'S RESTAURANTS OF TEXAS, INC.<br><br>*See* DIP Credit Agreement at Preamble, § 1.01<br><br>*See* Interim Order at ¶ 1 |
| **Guarantors**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | JGIL MILL OP LLC, JGIL MILLBURN LLC, JGIL, LLC, and JGIL OMAHA, LLC<br><br>*See* DIP Credit Agreement at Preamble, § 1.01 |
| **Security Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | None |
| **Postpetition Lender**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | CIT Bank, N.A., Garrison Funding 2018-1 LP, Garrison Funding 2018-2 LTD, Garrison MML CLO 2019-1 LP<br><br>*See* DIP Credit Agreement at Preamble at § 1.01<br><br>*See* Interim Order at ¶ 1 |

an overview of significant terms thereof and should only be relied upon as such. This motion is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the Interim Order. In the event that there is a conflict between this motion and the DIP Credit Agreement, the DIP Credit Agreement shall control in all respects, or in the case of a conflict between this motion and/or the DIP Credit Agreement and the Interim Order, the Interim Order shall control in all respects.

| Provision | Summary Description |
|---|---|
| **Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Subject to the provisions of DIP Credit Agreement § 2.08(b), (i) each LIBOR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of (A) the LIBO Rate for such Interest Period plus (B) the Applicable Margin; and (ii) each Base Rate Loan bear interest on the outstanding principal amount thereof from the applicable borrowing or conversion date at a rate per annum equal to the (A) Base Rate plus (B) the Applicable Margin.<br><br>"Applicable Margin" means the following percentages per annum: with respect to Revolving Loans, 7.00% for Base Rate Loans and 8.00 % for LIBOR Loans.<br><br>*See* DIP Credit Agreement at §§ 1.01, 2.08(a) |
| **Default Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | (a) when used with respect to Obligations other than a LIBOR Loan, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans plus (iii) 2% per annum; and (b) when used with respect to a LIBOR Loan, an interest rate equal to (i) the LIBO Rate applicable to such LIBOR Loan plus (ii) the Applicable Margin applicable to LIBOR Loans plus (iii) 2% per annum.  Interest Accruing at the Default Rate shall be immediately payable upon demand.<br><br>*See* DIP Credit Agreement at §§ 1.01, 2.08(b)<br><br>*See* Interim Order at § I(E) |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Borrowers shall pay, or cause to be paid, to the Administrative Agent for the account of each Revolving Lender in accordance with its Pro Rata Share, an unused fee equal to the product of (i) one-half of one percent (.50%) per annum times (ii) the average daily amount by which the total Revolving Commitments exceed the total outstanding amount of Revolving Loans.<br><br>On the Closing Date, the Borrowers shall pay, or cause to be paid, to Administrative Agent for the for the account of each Revolving Lender in accordance with its Pro Rata Share, a closing fee equal to 5.00% of the total Revolving Commitments on the Closing Date.  Such fee shall be fully earned when paid and shall be non-refundable for any reason whatsoever.<br><br>*See* DIP Credit Agreement at § 2.09 |

| Provision | Summary Description |
|---|---|
| | *See* Interim Order at § I(E) |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The earlier to occur of: (i) the closing of an Approved 363 Sale; and (ii) January 31, 2020.<br><br>*See* DIP Credit Agreement at § 1.01 |
| **Use of Proceeds/ Advances and Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)* | The advances under the DIP Facility (the "**Advances**") shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the DIP Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:<br><br>a)    to pay fees, costs, and expenses as provided in the DIP Financing Documents, including amounts incurred in connection with the preparation, negotiation, execution and delivery of the DIP Credit Agreement and the other DIP Financing Documents;<br><br>b)    for general operating and working capital purposes, for the payment of fees, expenses, and costs incurred in connection with the Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;<br><br>c)    for making other payments as provided in this Interim Order; and<br><br>d)    to fund the Carve-Out Reserve Account<br><br>*See* Interim Order at § I(C)(5)<br><br>*See* DIP Credit Agreement at § 6.11 |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)* | The Interim Order establishes the following milestones:<br><br>• Entry of the Final Order on or before twenty-five (25) days from the Petition Date, unless otherwise agreed in writing by the Pre-Petition Agent; |

| Provision | Summary Description |
|---|---|
| | • Bid Procedures Motion filed on or the second day following the Petition Date; |
| | • Entry of the Bid Procedures Order on or before December 5, 2019; |
| | • File the Approved 363 Sale Motion on or before the second day following the Petition Date; |
| | • Entry of the Approved 363 Sale Order by the Bankruptcy Court on or before December 20, 2019.<br><br>*See* Interim Order at §§ VII(A)(3)-(7) |
| **Conditions Precedent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The obligation of each Lender to make its initial Credit Extension is subject to satisfaction of the following conditions precedent:<br><br>• <u>Loan Documents</u>.  Receipt by the Administrative Agent of executed counterparts of DIP Credit Agreement, the Security Agreement, each Intellectual Property Security Agreement, the Notes (if requested), and the other Loan Documents to be executed as of the Closing Date, each properly executed by a Responsible Officer of the signing Loan Party and each other Person a party thereto.<br><br>• <u>Resolutions, Etc</u>.  Receipt by the Administrative Agent of the following, each dated as of a recent date before the Closing Date and in form and substance satisfactory to the Administrative Agent and its legal counsel such resolutions or other action, and incumbency certificates evidencing the identity, authority and capacity of each Responsible Officer thereof (A) executing any agreement, certificate or other document required to be delivered hereby (including the Loan Documents) or (B) authorized to act as a Responsible Officer in connection with the DIP Credit Agreement and the other Loan Documents to which such Loan Party is a party, in each case certified by a secretary or assistant secretary or other Responsible Officer of such Loan Party to be true and correct as of the Closing Date.<br><br>• <u>Pledged Stock; Stock Powers</u>.  Receipt by the Administrative Agent of certificates representing the shares of Capital Stock of the Borrowers and their Subsidiaries, together with an undated stock (or analogous) power for each such certificate executed |

| Provision | Summary Description |
|---|---|
| | in blank by a duly authorized officer of the pledgor thereof. |
| | <ul><li>Evidence of Insurance.  Receipt by the Administrative Agent of reasonable evidence that insurance required to be maintained by Section 5.10 is in full force and effect, including insurance certificates.</li></ul> |
| | <ul><li>Fees.  Receipt by the Administrative Agent and the Lenders of the fees required to be paid on or before the Closing Date under the DIP Credit Agreement.</li></ul> |
| | <ul><li>Attorney Costs.  The Loan Parties shall have paid all Attorney Costs of the Administrative Agent to the extent invoiced prior to the Closing Date.</li></ul> |
| | <ul><li>Bankruptcy Cases.  The Cases shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Cases shall be reasonably satisfactory, in form and substance, to the Administrative Agent and no trustee or examiner shall have been appointed with respect to the Debtors, or any of them, or any property of or any estate of any Debtor.</li></ul> |
| | <ul><li>Interim Order.  The Interim Order shall have been entered by the Bankruptcy Court on or before the second (2nd) Business Day after the Petition Date, which Interim Order (i) shall have been entered upon an application or motion of the Debtors reasonably satisfactory in form and substance to the Administrative Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the Administrative Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Loans, the issuance, extension or renewal of any Letters of Credit, or the performance by the Debtors of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein.  The Debtors and the Secured Parties shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration.</li></ul> |
| | <ul><li>Budget.  The Administrative Agent shall have received and</li></ul> |

| Provision | Summary Description |
|---|---|
| | approved the Budget. |

- <u>Cash Management Order</u>. The Bankruptcy Court shall have entered a customary "cash management order" adopting and implementing cash management arrangements for the Debtors, which shall be in form and substance and on terms and conditions satisfactory to the Administrative Agent in its sole and absolute discretion (any such order, the "<u>Cash Management Order</u>").

*See* DIP Credit Agreement at § 4.01

The obligation of each Lender to honor any Request for Credit Extension, whether on the Closing Date or at any time thereafter, is subject to the following conditions precedent:

- The representations and warranties of each Loan Party contained in <u>Article 5</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (<u>provided</u>, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation shall be true and correct in all respects) on and as of such date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

- No Default or Event of Default shall exist, or would result from such proposed Credit Extension; provided, however, that the Administrative Agent and the Lenders, in their sole and absolute discretion, may continue to make Credit Extensions notwithstanding the existence of a Default or Event of Default and that any Credit Extensions so made shall not be deemed a waiver of any such Default or Event of Default.

- The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

- The Interim Order shall have been entered by the Bankruptcy Court on or before the twenty-fifth (25th) Business Day after the Petition Date, which Interim Order (i) shall have been entered upon an application or motion of the Debtors reasonably satisfactory in form and substance to the Administrative Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the

| Provision | Summary Description |
|---|---|
| | Administrative Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Loans or the performance by the Debtors of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein. Until the date the Final Order shall have been entered by the Bankruptcy court, the Debtors and the Secured Parties shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration.<br><br>Each Request for Credit Extension submitted by the Borrower Representative shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified in <u>Section 4.02</u> have been satisfied on and as of the date of the applicable Credit Extension.<br><br>*See* DIP Credit Agreement at § 4.02<br><br>*See* Interim Order at § I(C)(6) |
| **Conditions Subsequent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Financial Statements**.  Deliver to the Administrative Agent for the benefit of each Lender as, as soon as available, but in any event within thirty (30) days after the end calendar month of the Loan Parties and their Subsidiaries, consolidated balance sheets of the Loan Parties and their Subsidiaries as at the end of such month, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding month of the previous Fiscal Year and to any budget provided pursuant to Section 6.02(c), all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Loan Parties and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.<br><br>**Certificates; Other Information**.  Deliver to the Administrative Agent for the benefit of each Lender, in form and detail |

| Provision | Summary Description |
|-----------|---------------------|
| | satisfactory to the Administrative Agent: |

satisfactory to the Administrative Agent:

<u>Liquor Licenses</u>.  Promptly upon the occurrence thereof, written notice thereof, if (x) five (5) or more Stores owned by the Loan Parties or any Subsidiary thereof suffer the loss of a liquor license for five (5) days or more in any 12-month period or (y) Stores accounting for $1,000,000 or more in Consolidated EBITDA in any 12-month period suffer the loss of a liquor license for five (5) days or more.

<u>Franchises</u>.  Promptly upon the occurrence thereof, written notice of (i) any failure to maintain any liquor license required to lawfully operate any Franchise, which failure is not cured within five (5) days of the occurrence thereof, (ii) any payment default by a Franchisee under a Franchise Agreement, which failure is not cured within five (5) days of the occurrence thereof and (iii) any other material default by a Franchisee under a Franchise Agreement, which failure is not cured within five (5) days of the occurrence thereof.

<u>Additional Information</u>.  Promptly (and in any event within three (3) Business Days after a request therefor), such additional information regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request (including as required under the Patriot Act).

<u>Budget</u>.  Furnish the Administrative Agent and the Lenders, no less frequently than every other week commencing on the Closing Date, a proposed updated Budget for the time period commencing on the Closing Date and ending on the Revolving Loan Maturity Date, which shall be in substantially the same form and detail of the Initial Budget, and accompanied by a certificate signed by a Responsible Officer of the Borrowers to the effect that such Budget has been prepared in good faith based upon assumptions which the Borrowers believe to be reasonable at the time made and in light of the conditions existing at the time of delivery thereof and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared (it being understood and agreed that the Borrowers may (but are not required to) furnish one or more proposed updated Budgets more frequently than every other week; provided that, such proposed Budget shall become the "Budget" or "DIP Budget" as defined and for all purposes hereunder and under the Interim

| Provision | Summary Description |
|---|---|
| | Order and (upon entry of the Final Order) the Final Order upon written approval thereof by the Administrative Agent and the Lenders in their sole and absolute discretion following a reasonable opportunity to review and comment thereon.<br><br>Variances from Budget. Deliver to the Administrative Agent on or before Wednesday of each week, a comparison of actual receipts and disbursements and actual Revolving Loans outstanding hereunder to projected receipts and disbursements and projected Revolving Loans outstanding hereunder of the prior week in a form substantially similar to that attached as Exhibit C to the DIP Credit Agreement. In addition, Debtors shall, and shall cause their Chief Restructuring Officer to attend calls no less than once a week to discuss the Borrowers' businesses and the status of the Cases with the Administrative Agent, the Lenders and the Administrative Agent's advisors.<br><br>Other Bankruptcy Documents. Deliver to the Administrative Agent: (i) substantially contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Debtors in the Cases, with copies of such papers and documents also provided to or served on the Administrative Agent's counsel; (ii) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (iii) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Cases, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Debtors to the Committee or any other official or unofficial committee in the Cases, with copies of such reports and term sheets also provided to or served on the Administrative Agent's counsel; and (iv) projections, operating plans and other financial information and information, reports or statements regarding the Debtors, their business and the Collateral as the Administrative Agent may from time to time reasonably request.<br><br>**Notices.**<br><br>• Promptly (and in any event within three (3) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of any Default or Event of Default. |

| Provision | Summary Description |
|---|---|
| | • Promptly (and in any event within three (3) Business Days) notify the Administrative Agent and each Lender in writing of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect. |
| | • Promptly (and in any event within three (3) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of any ERISA Event. |
| | • Promptly (and in any event within three (3) Business Days) notify the Administrative Agent and each Lender in writing of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary. |
| | • Promptly (and in any event within three (3) Business Days), notify the Administrative Agent and each Lender, in writing, of the threat or institution of, or any material development in, any Proceeding against or affecting any Loan Party, which could reasonably be expected to have a Material Adverse Effect. |
| | • Promptly (and in any event within three (3) Business Days of such event), notify the Administrative Agent in writing, of any loss, damage or destruction to the Collateral in the amount of $75,000 or more individually, whether or not covered by insurance. |
| | **Payment of Taxes.** |
| | • Pay and discharge as the same shall become due and payable, all federal and state income taxes and other material tax liabilities, assessments and governmental charges or levies in the nature of a tax upon it or its properties or assets, unless the same are being Properly Contested. |
| | • Timely file or cause to be timely filed all federal and state income tax returns and other material tax returns required by applicable law. |
| | **Preservation of Existence.** |
| | • Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05. |
| | • Preserve, renew and maintain in full force and effect its good |

| Provision | Summary Description |
|---|---|
| | standing and qualification to do business under the Laws of the jurisdiction of its organization and in any other jurisdiction where failure to so maintain good standing or qualification would have or would constitute a Material Adverse Effect. |

<br>

• Preserve, renew and maintain all Governmental Approvals as are necessary for the conduct of its business as currently conducted and herein contemplated.

• Preserve, register and renew whenever applicable all of its material registered patents, copyrights, trademarks, trade names and service marks.

**Maintenance of Properties**.  Maintain, preserve and protect all of its property necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted.

**Maintenance of Insurance**.  Maintain or cause to be maintained, with financially sound and reputable insurers rated not less than A-, Class VII by Best's, commercial general liability insurance, product liability insurance, business interruption insurance, and all risk property insurance, in each case with respect to liabilities, losses or damage in respect of the assets, properties and businesses of each Loan Party as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (after giving effect to any self-insurance in respect of (a) workers compensation insurance and (b) liability for insurance deductibles), with such deductibles, covering such risks, and in amounts and otherwise on such terms and conditions as shall be customary for such Persons (including perils of flood, quake and/or windstorm, as applicable) and reasonably acceptable to the Administrative Agent.  Each such policy of insurance shall (i) name Administrative Agent, on behalf of each Lender as an additional insured by endorsement thereunder as its interests may appear, (ii) in the case of each property insurance policy, contain a lender's loss payable clause or endorsement, satisfactory in form and substance to Administrative Agent, that names Administrative Agent, on behalf of Lenders, as the lender's loss payee thereunder and (iii) provide for at least thirty (30) days' (or ten (10) days' in the case of cancellation due to non-payment of premiums) prior written notice to Administrative Agent of any modification or cancellation of such policy.   Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to the Administrative Agent as its interests may

| Provision | Summary Description |
|-----------|---------------------|
|  | appear and further specify that the Administrative Agent shall be paid regardless of any act or omission by Debtor or any of their Affiliates.  The Administrative Agent and Secured Parties have no responsibility for premiums, warranties or representations to underwriters.   The Loan Parties or their insurance broker shall provide a certificate of insurance upon each policy renewal or replacement.  In the event Borrowers fail within five (5) Business Days after Administrative Agent's request to provide Administrative Agent with evidence of the insurance coverage required by this Agreement, Administrative Agent may purchase insurance at Borrowers' expense to protect the Administrative Agent's interests in the Collateral.  This insurance may, but need not, protect Borrowers' interests.   The coverage purchased by Administrative Agent may, but need not, pay any claim made by any Borrower or any claim that is made against any Borrower in connection with the Collateral.  Borrowers may later cancel any insurance purchased by Administrative Agent, but only after providing Administrative Agent with evidence that Borrowers have obtained insurance as required by this Agreement.   If Administrative Agent purchases insurance for the Collateral, to the fullest extent provided by law, Borrowers will be responsible for the costs of that insurance, including interest and other charges imposed by Administrative Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.   The costs of the insurance may be added to the Obligations.   The costs of the insurance may be more than the cost of insurance Borrowers are able to obtain on their own.<br><br>Borrowers will (i) use commercially reasonable efforts to obtain payment or reimbursement from any Directors and Officers Liability Insurance maintained by the Borrowers, (ii) provide copies of such policies to the Lenders upon request, (iii) provide written updates to the Lenders regarding their efforts to collect on such policy or policies and (iv) cause all on such policy or policies to be paid directly to the Borrowers.<br><br>**Compliance with Laws**.  Comply with the requirements of all Laws and Governmental Approvals applicable to it (including Environmental Laws and Franchise Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or Property, except in such instances in which such requirement of Law or order, writ, injunction or decree is being Properly Contested and except in each case, where the failure to comply would not reasonable be expected to have a Material Adverse |

| Provision | Summary Description |
|---|---|
| | Effect. |
| | **Books and Records.** |
| | • Maintain proper books of record and account, in which full, true and correct entries shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be, in each case in accordance with GAAP. |
| | • Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be. |
| | **Inspection Rights**. Permit representatives and independent contractors of the Administrative Agent (or Garrison Middle Market Funding II LP and representatives thereof) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and conduct audits and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Loan Parties. A representative of each Lender shall have the right to accompany the Administrative Agent in connection with all such inspections, audits and examinations, at such Lender's sole cost and expense unless an Event of Default shall have occurred and be continuing. |
| | **Additional Subsidiaries**. |
| | Borrowers shall cause each Domestic Subsidiary (other than a Foreign Subsidiary Holdco, CFC or a Subsidiary of a Controlled Foreign Subsidiary) hereafter formed or acquired to execute and deliver to the Administrative Agent, within 30 days (or such longer period as the Agent shall agree in its sole discretion) of the formation or acquisition thereof, a joinder to the Loan Documents, in form and substance acceptable to the Agent, pursuant to which such Subsidiary shall become a Borrower or a Guarantor, as the Administrative Agent shall elect. Borrowers shall deliver to the Administrative Agent (i) appropriate Lien searches indicating the Administrative Agent's first priority Lien (subject to Permitted Liens) on such Subsidiary's personal property, (ii) a favorable |

| Provision | Summary Description |
|---|---|
| | written opinion of counsel reasonably satisfactory to the Agent, (iii) original stock certificates or other certificates evidencing equity ownership in such Domestic Subsidiary, accompanied by stock or other appropriate transfer powers duly executed in blank, with regard to the Capital Stock of such Domestic Subsidiary, (iv) certified copies of the Organization Documents of such Domestic Subsidiary, along with appropriate resolutions and an incumbency certificate of such Domestic Subsidiary and (v) such other agreements, instruments, approvals or other documents as the Administrative Agent may reasonably request with respect thereto.<br><br>With respect to each first-tier Foreign Subsidiary that is a CFC and any Foreign Subsidiary Holdco, Borrowers shall within thirty (30) days (or such longer period as the Administrative Agent shall agree in its sole discretion) of the formation or acquisition thereof, take all actions reasonably requested by the Administrative Agent to grant to the Administrative Agent a perfected Lien on no more than 65% of each class of the Capital Stock of such Subsidiary entitled to vote (within the meaning of Treasury Regulation Section 1.956-2(c)(2)) and 100% of each class of the Capital Stock of such Subsidiary not entitled to vote (within the meaning of Treasury Regulation Section 1.956-2(c)(2)) of such CFC. For the avoidance of doubt, no CFC or Foreign Subsidiary Holdco shall be required to pledge any of the Capital Stock of their respective Subsidiaries.<br><br>**ERISA Compliance**. Do, and cause each of its ERISA Affiliates to, except to the extent such failure would not reasonably be expected to result in a Material Adverse Effect, do each of the following: (a) maintain each Plan in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Law; (b) cause each Plan that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; and (c) make all required contributions to any Plan subject to Section 412, Section 430 or Section 431 of the Internal Revenue Code.<br><br>**Cash Management; Control Agreements**. The Borrowers shall, and shall cause each Subsidiary to, maintain with CIT each of their primary operating and deposit accounts and each securities account (other than Excluded Accounts), provided that (i) local deposit accounts maintained with respect to any Store may remain at and continue to be maintained with another financial institution, but amounts credited thereto (other than amounts reasonably expected to be applied towards expenditures in accordance with the Budget |

| Provision | Summary Description |
|---|---|
| | within the immediately following five (5) Business Day period) shall be required to be transferred to one or more deposit accounts maintained with CIT in accordance with the Cash Management Order and the Borrowers' customary practices.

**Covenant with Respect to Environmental Matters**.  In respect of all environmental matters:

•  comply in all material respects with the requirements of all federal, state, and local Environmental Laws applicable to the Loan Parties or their Property;

•  notify the Administrative Agent promptly in the event of any spill, release or disposal of Hazardous Material on, or hazardous waste pollution or contamination affecting, the Facilities in material violation of applicable Environmental Laws of which a Loan Party has actual knowledge;

•  forward to the Administrative Agent promptly any written notices relating to such matters received from any Governmental Authority; and pay when due any fine or assessment against the Facilities arising under Environmental Laws, provided, that the Loan Parties shall not be required to pay any such fine or assessment so long as the validity thereof shall be Properly Contested; and provided further that, in any event, payment of any such fine or assessment shall be made before any of their Property shall be subjected to a Lien or be seized or sold in satisfaction thereof;

•  promptly notify the Administrative Agent upon becoming aware of any fact or change in circumstances that would be expected to cause any of the representations and warranties contained in Section 5.09 to cease to be true in all material respects (without duplication of any materiality qualifier therein) for any time before the Termination Date;

•  not become involved, and will not knowingly permit any tenant of the Facilities to become involved, in any operations at the Facilities generating, storing, disposing, or handling Hazardous Materials in material violation of applicable Environmental Laws or any other activity that could reasonably be expected to lead to the imposition on any Lender or the Administrative Agent of any liability, or the imposition on the Loan Parties or the Facilities of any material liability or any lien under any Environmental Laws;

•  promptly contain or remove any Hazardous Materials found on the Facilities in violation of any applicable Environmental Law, |

| Provision | Summary Description |
|---|---|
| | to the extent required by and in compliance with applicable Environmental Laws and at the Borrowers' expense; and the Borrowers agree that the Administrative Agent has the right, at its sole option but at the Borrowers' expense, to have an environmental engineer or other representative review the work being done; and<br><br>• indemnify, protect, defend and hold harmless each Indemnitee from and against and all liabilities, obligations, losses, damages (including, consequential damages), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, the reasonable fees and disbursements of counsel for and consultants of such Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not such Indemnitees shall be designated a party thereto), which may be imposed on, incurred by, or asserted against such Indemnitees (whether direct, indirect, or consequential) now or hereafter arising as a result of any claim for environmental cleanup costs, any resulting damage to the environment and any other environmental claims against any Loan Party, any Lender, the Administrative Agent, any other Indemnitee or the Facilities.  The provisions of this <u>Section 6.15(e)</u> shall continue in effect and shall survive the Termination Date.<br><br>**Site Leases**.  The Borrowers shall, and shall cause each Subsidiary to, perform and carry out in all material respects the material terms and provisions of Site Leases, except in each case as would not reasonably be expected to result in a Material Adverse Effect.<br><br>**Budget Compliance**.<br><br><u>Disbursements Covenant</u>.  Commencing with the weekly period ending November 24, 2019, reflected in the Initial Budget delivered as of the Closing Date, cause Debtors' (i) "Operating Disbursements" or "Other Chapter 11 Related Cash Flows" (as such terms are described in the applicable Budget), (A) on an individual basis to be not more than 105% and (B) on an aggregate basis to be not more than 110% (provided, however, that, in each of clauses (A) and (B), in the Administrative Agent's sole and absolute discretion and without court order, approval of, or notice to, any other Persons, the Administrative Agent may increase such percentage up to 107% (in the case of clause (A)) and up to 115% (in the case of clause (B)) of forecasted Operating Disbursements or Other Chapter 11 Related Cash Flows set forth in the Budget for the applicable period (the "<u>Permitted Variance</u>") or (ii) "Chapter |

| Provision | Summary Description |
|---|---|
| | 11 Professional Costs" (as such term is described in the applicable Budget) to be more than the forecasted Chapter 11 Professional Costs set forth in the Budget for the applicable period, in each case, such covenant to be tested on a rolling four-week period, commencing with the four-week period ending on December 15, 2019.<br><br>Minimum Receipt Covenant.    Commencing with the weekly period ending November 24, 2019 reflected in the Initial Budget delivered as of the Closing Date, cause Debtors' receipts, (i) on an individual basis to be at least 95% and (ii) on an aggregate basis to be at least 90% (provided, however, that, in each of clauses (i) and (ii), in the Administrative Agent's sole and absolute discretion and without court order, approval of, or notice to, any other Persons, the Administrative Agent may decrease such percentage down to 93% (in the case of clause (i)) and down to 85%) of the forecasted receipts as set forth in the Budget for the applicable period, such covenant to be tested on a rolling four-week basis; provided that for the initial three weekly tests such covenant shall be tested against the Budget as follows: (i) for the second week based on two weeks forecast and two weeks actual; and (ii) for the third week based on three weeks forecast and three weeks actual, in each case, on a cumulative basis.<br><br>**Bankruptcy Schedules and Covenants**.<br><br>File with the Bankruptcy Court and deliver to the Administrative Agent, all Schedules of the Debtors within the time periods required by the Bankruptcy Code as may be extended by express written consent of the Administrative Agent and subject to approval by the Bankruptcy Court.<br><br>Serve all:<br><br>• secured creditors, all judgment creditors (if any) actually known to the Debtors, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Authorities holding a claim, any of the Debtors' unions, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and<br><br>• all parties from whom the Debtors have received or that the |

| Provision | Summary Description |
|---|---|
| | Debtors believe they may have received goods from within twenty (20) days of the filing of the Cases, a copy of the Interim Order and notice of the hearing on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure. |
| | **Patriot Act; OFAC.** (a) Comply with the Patriot Act, (b) use no part of the proceeds of the Loans, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, and (c) comply with the OFAC Sanctions. |
| | *See* DIP Credit Agreement at §§ 6.01-21 |
| **Termination Events & Remedies** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br><br> *Del. Bankr. L.R. 4001-2(a)(ii)* | **Events of Default**. Any of the following shall constitute an Event of Default: <br><br> • The occurrence of any Event of Default as defined and under the DIP Credit Agreement. <br><br> • The failure of the Debtors to obtain entry of a Final Order on or before twenty-five (25) days from the Petition Date, unless otherwise agreed in writing by the Pre-Petition Agent and the DIP Agent. <br><br> • The failure of Debtors to file on or before the second day following the Petition Date the Bidding Procedures Motion. <br><br> • The Bidding Procedures Order is not entered by the Bankruptcy Court on or before December 5, 2019. <br><br> • The failure of Debtors to file on or before the second day following the Petition Date the Approved 363 Sale Motion. <br><br> • The Approved 363 Sale Order is not entered by the Bankruptcy Court on or before December 20, 2019. <br><br> *See* Interim Order at § (VII)(A) <br><br> **Remedies upon Event of Default**. <br><br> (1) Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further Order of the Bankruptcy Court (i) the |

| Provision | Summary Description |
|---|---|
|  | DIP Agent and DIP Lenders shall no longer have any obligation to make any Advances (or otherwise extend credit) under the DIP Facility; (ii) all amounts outstanding under the DIP Financing Documents shall, at the option of the DIP Agent, be accelerated and become immediately due and payable; (iii) the DIP Agent shall have the right to issue the Carve Out Trigger Notice, (iv) the DIP Agent and the Pre-Petition Agent shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or order of this Court, provided, however, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the DIP Budget through and including the date immediately following the date on which such Event of Default occurs, (v) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents and the Pre-Petition Financing Documents, (vi) the DIP Agent shall be entitled to charge the default rate of interest under the DIP Credit Agreement and (vi) subject only to the notice requirement set forth in Section VII(B)(2) of the Interim Order, both the DIP Agent and the Pre-Petition Agent shall be entitled to take any other act or exercise any other right or remedy as provided in the Interim Order, the DIP Financing Documents, the Pre-Petition Financing Documents, or applicable law, including, without limitation, setting off any Post-Petition Obligations or Pre-Petition Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession of any Pre-Petition Secured Party or DIP Lender, and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Collateral, as applicable

(2) Without further notice, application or order of this Court, upon the occurrence and during the continuance of an Event of Default, and after providing five (5) business days' prior written notice thereof (which five (5) business days period only applies to the DIP Collateral enforcement remedies described below) to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee, the DIP Agent for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, as applicable, shall be entitled to take any action and exercise all rights and remedies provided to them by this Interim Order, the DIP Financing Documents or the Pre-Petition Financing Documents, or applicable law, unless otherwise ordered by this Court, as the DIP Agent or the Pre-Petition Agent, as applicable, may deem appropriate in |

| Provision | Summary Description |
|---|---|
|  | their sole discretion to, among other things, proceed against and realize upon the DIP Collateral (including the Pre-Petition Collateral) or any other assets or properties of the Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Pre-Petition Obligations and Post-Petition Obligations. Notwithstanding the foregoing or anything in Section VII(B)(1) of the Interim Order, DIP Agent may continue to apply proceeds received into the lockbox or collection account to reduce the Post-Petition Obligations in any order at the sole discretion of the DIP Agent during such five (5) business days period. During such five business days period, either or both the Debtors and the Committee shall be entitled to seek an emergency hearing with this Court.<br><br>Additionally, upon the occurrence and during the continuance of an Event of Default and the exercise by the DIP Agent or the Pre-Petition Agent of their respective rights and remedies under this Interim Order, the DIP Financing Documents, or Pre-Petition Financing Documents, provided that the Debtors and the DIP Agent agree upon a mutually acceptable wind down budget, the Debtors shall cooperate with the DIP Agent in the exercise of rights and remedies and assist the DIP Agent in effecting any sale or other disposition of the DIP Collateral required by the DIP Agent, including any sale of DIP Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of DIP Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in each case, upon such terms that are acceptable to the DIP Agent.<br><br>(3) Upon the occurrence and during the continuance of an Event of Default, and subject to the five business days notice provision provided above, in connection with a liquidation of any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) shall have the right, at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; provided, however, the DIP Agent and Pre-Petition Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any pre-petition (and, if applicable, post-petition) landlord waivers or consents, or (c) |

| Provision | Summary Description |
|---|---|
| | further order of this Court on motion and notice appropriate under the circumstances; and (ii) upon entry of a Final Order, use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, provided, however, DIP Agent may use such assets upon entry of this Interim Order to the extent permitted by applicable non-bankruptcy law. The DIP Agent and the DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) for the period of time that the DIP Agent actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the DIP Agent actually occupies or uses such assets or properties).<br><br>(4) The rights and remedies of the DIP Agent specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and/or Pre-Petition Agent may have under the DIP Financing Documents, Pre-Petition Financing Documents, or otherwise and may be exercised in whole or in part in any order.<br><br>*See* Interim Order at § (VII)(B) |
| **Security and Priority**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable:<br><br>(a)  for all Obligations now existing or hereafter arising and for diminution in value of any Pre-Petition Collateral used by the Debtors pursuant to the Interim Order, DIP Credit Agreement or otherwise, the Administrative Agent, for the benefit of itself and the other Secured Parties, is granted an allowed superpriority administrative claim in the Debtors' estates pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of any of the Debtors, whether now in existence or hereafter incurred by any of the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to the Bankruptcy Code, including without limitation, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507, 364(c)(1), 546(c), 726 |

| Provision | Summary Description |
|---|---|
| | or 1114 of the Bankruptcy Code, subject as to priority only to the Carve-Out; and<br><br>(b) (i) to secure the prompt payment and performance of any and all Obligations of the Debtors to the Secured Parties of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Administrative Agent, for the benefit of itself and the other Secured Parties, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject to the Senior Liens (as defined in the Interim Order) and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of the Debtors, whether existing on the Petition Date or thereafter acquired (1) pursuant to Section 364(c) (2), that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, the "Unencumbered Property"), (2) pursuant to Section 364(c) and (d) of the Bankruptcy Code, all of the Pre-Petition Collateral, and (3) pursuant to Section 364(c) and (d) of the Bankruptcy Code, all of the Collateral (as defined in the DIP Credit Agreement), (ii) such security interests and Liens shall be senior in all respects to interests of other parties arising out of security interests or Liens, if any, in such assets and property existing immediately prior to the Petition Date and (iii) the Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.<br><br>*See* DIP Credit Agreement at § 5.22 |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and First Lien Adequate Protection Claims, and any other liens or claims granted by this Interim Order or the Final Order shall be subject only to the right of payment and priority of the following expenses (collectively, the "**Carve-Out**"), to the extent provided herein:<br><br>(1) the allowed administrative expenses pursuant to 28 U.S.C. § 1930 for fees payable to the U.S. Trustee or to this Court, unless otherwise ordered by this Court; and<br><br>(2) the allowed fees and expenses actually incurred by persons or firms retained by the Debtors or the Committee (if appointed) on or after the Petition Date whose retention is approved by the Bankruptcy Court pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (each a "**Professional**" and collectively, the "**Professionals**") in a cumulative, aggregate sum |

| Provision | Summary Description |
|---|---|
| | of (i) for the period prior to the occurrence of the delivery of a Carve-Out Trigger Notice (as defined below), an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted to be funded in advance for each such Professional for such week in accordance with the DIP Budget (to the extent a Carve-Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for each Professional incurred on or after the Petition Date up through and including the date a Carve-Out Trigger Notice is delivered ("**Allowed Professional Fees**"), subject in all respects to the terms of this Interim Order, the Final Order, and any other interim or other compensation order entered by the Bankruptcy Court (the "**Interim Compensation Procedures**").  The Carve-Out shall include all Allowed Professional Fees that are incurred or earned (i) at any time before delivery of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, subject and limited in all respects to the amounts set forth in the DIP Budget for payment of such Professionals; and (ii) beginning the first day after the delivery by the DIP Agent of written notice (which for the avoidance of doubt may be by electronic mail) of the occurrence of an Event of Default (the "**Carve-Out Trigger Notice**") to the Debtors, the Debtors' counsel, and counsel for any Committee, the fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed $75,000 (the "**Post-EOD Carve-Out Amount**") (the aggregate amount of clauses (1) and (2), collectively, the "**Carve-Out Cap**"); *provided, however* the Carve-Out shall not include any bonus, sale transaction fees, success fees, completion fees, substantial contribution fees, or any other fees of similar import of any of the Professionals. Notwithstanding the foregoing, the Carve-Out Trigger Notice shall be deemed to have been delivered to the required notice parties on the Termination Date.<br><br>        (3)  Subject to the terms of the Interim Order, the Carve-Out Cap shall be allocated on a Professional by Professional basis based on the amounts budgeted to be funded in advance for each Professional pursuant to the Budget.<br><br>*See* Interim Order at § VI(M) |
| **DIP Budget**<br><br>*Fed. R. Bankr. P. 4001(b)(1)* | The use of extensions of credit under the DIP Facility shall be in accordance with the DIP Budget, subject to the Permitted Variances (as defined in the DIP Credit Agreement) and as |

| Provision | Summary Description |
|---|---|
| *and (c)(1)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | provided in Section 6.7 of the DIP Credit Agreement. The Budget shall be updated by the Debtors no less frequently than every two (2) weeks in accordance with the terms and provisions the DIP Credit Agreement. A copy of any updated DIP Budget shall be filed with this Court within one (1) Business Day after it has been approved by the DIP Agent.<br><br>*See* Interim Order at § I(C)(4). |

### G.    Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)

25.    The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i). As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Chapter 11 Cases and should be approved.

a.    **Local Rule 4001-2(a)(i)(A) — *Cross Collateralization*.** None.

b.    **Local Rule 4001-2(a)(i)(B) — *Validity, Perfection and Amount of Prepetition Secured Obligations*.**

*Debtors' Acknowledgment and Agreements*

*See* Interim Order at ¶¶ (D)(1)-(3)

c.    **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver*.**

*See* Interim Order at § IX(A)

d.    **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.** To secure the prompt payment and performance of any and all Post-Petition Obligations of Borrower and Guarantors to the DIP Agent and the DIP Lenders of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective nunc pro tunc as of the Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected first priority (subject only to any Senior Liens and the Carve-Out), security interests and liens in and upon all claims and causes of action under Chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") of the Debtors or the Estates and proceeds thereof upon entry of the Final Order. *See* Interim Order at § II(A)(2).

e.      **Local Rule 4001-2(a)(i)(E) —** *Use of Postpetition Debt from Prepetition Creditor to Pay Such Prepetition Creditors' Prepetition Debt*. The DIP Facility does not include the payment of any prepetition debt.

f.      **Local Rule 4001-2(a)(i)(F) —** *Treatment of Committee Professionals*. The Committee's professional fees are included in the Carve-Out. As discussed above, the DIP Facility is subject and subordinate to the Carve-Out. *See* Interim Order at § V(A)(3).

g.      **Local Rule 4001-2(a)(i)(G) — Non-Consensual Priming Provisions**. Subject to any applicable Senior Liens, pursuant to Bankruptcy Code section 364(d), valid, enforceable, and fully perfected first priority senior priming security interests in and senior priming liens upon all of the Debtors' right, title, and interest in, to, and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the security interests and liens held by the Pre-Petition Agent, on behalf of the Pre-Petition Secured Parties; and (ii) the Adequate Protection Liens. *See* Interim Order at § II(A)(3)(c).

h.      **Local Rule 4001-2(a)(i)(H) — 552(b) Waiver**. Effective upon the entry of a Final Order, the Pre-Petition Secured Parties and DIP Lenders shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Pre-Petition Secured Parties and DIP Lenders with respect to proceeds, products, offspring or profits of any of the Pre-Petition Collateral or DIP Collateral, as applicable. *See* Interim Order at § IX(A).

## RELIEF REQUESTED

26.     By this motion, the Debtors request entry of the Interim Order and Final Order authorizing the Debtors to enter into the DIP Facility. More specifically, the Debtors seek authority to:

a.      Enter into, execute and perform under (i) the DIP Credit Agreement and (ii) all DIP Financing Documents;

b.      Take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents, the Interim Order and Final Order;

c.      Grant to the DIP Agent, for itself and on behalf of the DIP Lenders, first priority, priming, valid, perfected and enforceable Liens (as defined in section 101(37) of the Bankruptcy Code) in and upon all of the DIP Collateral, subject only to the Carve-Out and any Senior Liens, to secure all Post-Petition Obligations;

d.    Grant to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claim status for the Post-Petition Obligations, subject only to the Carve-Out;

e.    Use Cash Collateral in accordance with the terms of the DIP Financing Documents and as limited by the DIP Budget;

f.    Grant adequate protection, including without limitation Adequate Protection Liens, First Lien Adequate Protection Claims, and First Lien Adequate Protection Payments to the Pre-Petition Secured Parties all such adequate protection with the priority set forth in this Interim Order and otherwise in accordance with the terms set forth in this Interim Order, with respect to the use and aggregate diminution in the value of their respective interests in the Pre-Petition Collateral), including the Cash Collateral;

g.    Apply collections and proceeds of all of the Pre-Petition Collateral and DIP Collateral, payment of any First Lien Adequate Protection Payments and Post-Petition Obligations in the manner and on the terms set forth in the Interim Order (and, as applicable, by the Final Order);

h.    Waive, upon entry of the Final Order, any right to surcharge the DIP Collateral and the Pre-petition Collateral pursuant to section 506(c) of the Bankruptcy Code, (b) any rights under the "equities of the case" exception in section 552(b) of the Bankruptcy Code, and (c) the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the Pre-petition Collateral;

i.    Modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rules 4001(a)(3);

j.    Wave any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order; and

k.    Set a Final Hearing for entry of a Final Order authorizing the post-petition financing and use of cash collateral contemplated hereby on a final basis and granting such other relief as is requested in the Motion and approving the form of notice with respect to the Final Hearing.

## A.    Financing Under Bankruptcy Code Section 364

27.    Pursuant to Bankruptcy Code section 364(c), a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, as an administrative

expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[5]

*see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(authorizing superpriority administrative expenses where debtor could not obtain credit as an

administrative expense).

28.     Additionally, Bankruptcy Code section 364(d)(1) provides that a court may

authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is

unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the

holder of the lien on the property of the estate on which such senior or equal lien is proposed to

be granted. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part,

that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the
> lien on the property of the estate on which such senior or equal lien
> is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.     Courts in this jurisdiction and others have fashioned guidelines in applying these

statutory requirements.   Generally, courts advocate using a "holistic approach" to evaluate

superpriority postpetition financing agreements, focusing on the transaction as a whole. As one

court has noted:

---

[5] Specifically, Bankruptcy Code section 364(c) provides, in pertinent part, that: "If the trustee [or debtor in
possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative
expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt — (1)
with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2)
secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien
on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

30.     More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the debtor's business, (b) is in the best interests of the debtor's creditors and estates, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lender on the other, and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender. *See, e.g., In re Indianapolis Downs, LLC*, Case No. 11-11046 (BLS) (Bankr. D. Del. Apr. 26, 2011); *In re East West Resort Dev. V, L.P., L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. Mar. 11, 2010); *In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009); *In re LandSource Communities Dev. LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008, as amended May 22, 2009).

31.     The Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**B.      Entry into the DIP Facility is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets, and is an Exercise of the Debtors' Sound and Reasonable Business Judgment**

32.     A debtor's decision to enter into a postpetition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. *See, e.g., Trans World*

*Airlines, Inc. v. Travelers Intl AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *In re Barbara K Enters.,* No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *Ames,* 115 B.R at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

33.    Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor-in-possession is afforded discretion to act with regard to business decision-making. *See Simasko Prod. Co.,* 47 B.R. at 449 ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

34.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also Curlew Valley Assocs.,* 14 B.R. at 513-14 (noting that courts should not second guess a

debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (citation omitted).

35.    The Debtors' decision to incur the proposed DIP Facility satisfies this standard. This decision is the culmination of an intense process targeted at procuring the best available financing under the circumstances.    Because the Debtors had no other viable financing alternative, if the Debtors rejected the DIP Facility, it would not be able to continue operating its businesses, resulting in lost jobs and a destruction of value.

36.    Incurring the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.    Thus, obtaining the DIP Facility is an exercise of the Debtors' sound business judgment.    Given the Debtors' significantly constrained liquidity position, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these Chapter 11 Cases and the general uncertainty in the marketplace that will accompany this process.

37.    Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their restaurants in an orderly manner, maintain business relationships and assure the continuity of operations with, and ability to make payment to, vendors, pay employees, and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the value of the Debtors' estates for the benefit of all stakeholders.

C.    **The Terms of the DIP Facility are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment**

38.    It is well recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *See, e.g., Snowshoe Co. Inc.*, 789 F.2d at 1088 (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989); *see also In re Garland Corp.,* 6 B.R. 456, 461 (1st Cir. B.A.P. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames*, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

39.    Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Bankruptcy Code sections 364(a) and 364(b). *See Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

40.    The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any other commercially reasonable terms, and certainly not on the favorable terms offered by the DIP Lenders. As discussed above and in the Declarations, the DIP Facility was the only available financing that

satisfied the Debtors' needs. Accordingly, the Debtors submit that the terms of the DIP Facility are reasonable and represent the best source of financing available to the Debtors under the circumstances.

41.    Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization); *see also In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) (noting "there is no *per se* rule against paying pre-petition secured claims outside of a plan of reorganization" which can be accomplished through a "roll-up" where "[t]he proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor").

42.    The Pre-Petition Agent has explicitly stated that it will not agree to an alternative DIP Facility with less favorable terms, which the Debtors have been unable to procure. Accordingly, for the reasons set forth above and in the Declarations, the Debtors submit a substantial showing has been made that the DIP Facility contains not only the most favorable terms available, it is likely the only source of postpetition financing available to the Debtors.

**D.    The Scope of the Carve-Out is Appropriate**

43.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out. Similar Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Facility does

not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these Chapter 11 Cases. *See id.* at 38 (observing that courts insist on Carve-Outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**E.**      **The Payment of Costs and Expenses to the DIP Lender is Appropriate**

44.      The fees, costs and expenses to be paid to the DIP Lenders pursuant to the DIP Facility are within the range of reasonableness and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Bankruptcy Code section 364. *See Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) (approving financing facility pursuant to Bankruptcy Code § 364 that included a lender "enhancement fee"). Here, the DIP Lender is asking for much less than a postpetition lender would usually request.

**F.**      **The DIP Facility was Negotiated in Good Faith and Should**
            **be Afforded the Protection of Bankruptcy Code Section 364(e)**

45.      Pursuant to Bankruptcy Code section 364(e), any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under Bankruptcy Code section 364 shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

46.    The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, and all of the Post-Petition Obligations will be extended by the DIP Lenders in good faith (as such term is used in Bankruptcy Code section 364(e)).  No consideration is being provided to any party in connection with the DIP Lenders other than as set forth herein.  Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by Bankruptcy Code section 364(e), and the DIP Lenders should be entitled to the full protection of Bankruptcy Code section 364(e) in the event that the Interim Order or the Final Order or any provision thereof is vacated, reversed or modified on appeal or otherwise.  *See* 11 U.S.C. § 363(e).

**G.    The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate**

47.    The Pre-Petition Secured Parties do not object to the use of Cash Collateral in accordance with the DIP Budget (subject to the Permitted Variances) and to the imposition of the Carve-Out, in consideration of the availability of the DIP Facility and in consideration of receiving the adequate protection described herein.

48.    As adequate protection for the priming of the Pre-Petition Secured Parties by the Post-Petition Obligations, the Pre-Petition Secured Parties shall receive, to the extent of any diminution in value of their interest in the collateral securing the Pre-Petition Obligations (collectively the "Adequate Protection"):

- valid, binding, enforceable and perfected replacement and additional security interests in and liens ("First Lien Adequate Protection Liens") on all the Debtors' right, title, and interest in and to the DIP Collateral to the extent of the First Lien Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens and the Carve Out.;

- to the extent that the First Lien Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Agent's interest in the Pre-Petition Collateral, the Pre-Petition Agent, for the benefit of the Pre-Petition Lenders, is hereby granted an

allowed superpriority administrative expense claim ("First Lien Adequate Protection Claim") against the Estates under Bankruptcy Code sections 503 and 507(b), which shall, subject only to the DIP Superpriority Claim and the Carve-Out, have priority over all other administrative expense claims, priority claims and unsecured claims against the Debtors or the Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c) (upon entry of the Final Order), 726, 1113 and 1114;

- the Pre-Petition Agent, for the benefit of the Pre-Petition Lenders, shall be entitled to interest on account of the outstanding Pre-Petition Obligations at the default rate set forth in the Pre-Petition Financing Documents, which was in effect as of the Petition Date and which shall accrue in the manner set forth in the Pre-Petition Financing Documents; and

- as further adequate protection, and without limiting any rights of the Pre-Petition Agent, for the benefit of the Pre-Petition Lenders, under Bankruptcy Code section 506(b) which are hereby preserved, the Debtors shall pay or reimburse the Pre-Petition Agent and the Pre-Petition Lenders ("First Lien Adequate Protection Payments") for any and all of its reasonable fees, costs, expenses and charges accrued and payable under the Pre-Petition Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Agent as provided in Section 12.05 of the Pre-Petition Credit Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion or application to, order of, or hearing before, this Court

49.     The DIP Facility contemplates providing the DIP Lenders with liens that prime those of the Pre-Petition Secured Parties pursuant to Bankruptcy Code section 364(d). Accordingly, the Debtors are required to show that the interests of the Pre-Petition Secured Parties are "adequately protected." 11 U.S.C. § 364(d).  Additionally, pursuant to Bankruptcy Code section 363(c), the Debtors may only use Cash Collateral of the Pre-Petition Secured Parties subject to the consent of those parties or the grant of adequate protection.  11 U.S.C. § 363(c)(2).

50.     What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens, and administrative claims. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello,* 195 B.R.

277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Sw. Assocs.*, 140 B.R. 360, 362 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993).

51.     In light of the Adequate Protection described above, the Pre-Petition Secured Parties have consented to the terms of the Interim Order and the DIP Facility.

**H.     Approval of the DIP Facility on an Interim Basis
        is Necessary to Prevent Immediate and Irreparable Harm**

52.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

53.     In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *Ames*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames*, 115 B.R. at 36.

54.    The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district. *See, e.g.*, *In re Taylor-Wharton Int'l LLC*, Case No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Ctr. Inc.,* Case No. 09-13911 (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.*, Case No. 09-11424 (Bankr. D. Del. May 28, 2009); *In re Abitibi-Bowater Inc.*, Case No. 09-11296 (Bankr. D. Del. Apr. 20, 2009); *In re EZ Lube, LLC*, Case No. 08-13256 (Bankr. D. Del. Jan 14, 2009).

55.    Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail herein and in the Stratton Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, maintain their restaurants, provide comfort to their employees, customers and vendors as well as to continue to operate their business, maintain key business relationships, make payroll and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

56.    Without approval of the DIP Facility, customers may take their business elsewhere and vendors might discontinue the provision of goods and services, which would disrupt operations and frustrate the Debtors' sale and efforts in these Chapter 11 Cases. Additionally, absent access to liquidity under the DIP Facility, the Debtors face the potential inability to satisfy their payroll and other direct operating expenses necessary to run their businesses in the ordinary course.  Thus, availability of sufficient working capital and liquidity is vital to the preservation and maintenance of the value of the Debtors' estates.  Simply put, the Debtors are trying to maximize the value of their assets through a sale process that is wholly

dependent upon additional financing, and the only additional financing available is the DIP

Facility—which, fortunately, has been offered on favorable terms.

**I.     Modification of the Automatic Stay Provided Under Bankruptcy
Code Section 362 is Appropriate Under the Circumstances**

57.     The Interim Order proposes that, unless otherwise ordered by the Court, the Pre-

Petition Agent, on behalf of the other Pre-Petition Secured Parties, and DIP Agent, on behalf of

the other DIP Secured Parties, shall be automatically and completely relieved from the effect of

any stay under Bankruptcy Code section 362, any other restriction on the enforcement of their

liens upon and security interests in the DIP Collateral or any other rights granted to them, or any

of them, pursuant to the terms and conditions of the DIP Financing Documents, the Pre-Petition

Financing Documents or the Interim Order.  The Interim Order also proposes that, on the fifth

(5th) business day after notice to the Debtors of an Event of Default, the DIP Agent and/or Pre-

Petition Agent shall have automatic and immediate relief from the automatic stay Bankruptcy

Rules 6004(h) and 4001(a)(3), and shall be entitled to exercise all rights and remedies under the

DIP Financing Documents, Pre-Petition Financing Documents, or otherwise.  *See* Interim Order

at § VII(R)(4).

58.     Stay modification provisions of this sort are ordinary and usual features of debtor-

in-possession financing facilities and, in the Debtors' business judgment, are reasonable under

the present circumstances.  Accordingly, the Court should modify the automatic stay to the

extent contemplated under the proposed Interim Order and, subsequently, the Final Order.

**REQUEST FOR FINAL HEARING**

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c),

the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable,

but in no event later than twenty-five (25) days after the Petition Date and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES REGARDING
## NOTICE AND STAY OF AN ORDER

60.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

## NOTICE

61.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (i) the Office of the United States Trustee for this District (the "U.S. Trustee"); (ii) the Internal Revenue Service and all taxing authorities of states in which the Debtors are doing business; (iii) counsel to the DIP Agent; (iv) the holders of the thirty (30) largest unsecured claims against the Estates; (v) all parties known to the Debtors who hold any liens or security interests in the Debtors' assets, including those parties who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (vi) all landlords and warehouseman of the Debtors; (vii) all guarantors of the Pre-Petition Obligations; (viii) all creditors known to the Debtors to be holding a judgment against any of the Debtors; (ix) any governmental bodies holding a claim against the Debtors; (x) any other parties claiming an interest in the Pre-Petition Collateral; and (xi) all other parties entitled to receive notice pursuant to the Bankruptcy Rules and the Local Rules (collectively, the "Notice Parties").  As the Motion is seeking "first day" relief, within two (2) business days of the Interim Hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

62.     No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, for the reasons set forth herein and in the Declarations, the Debtors respectfully request entry of the DIP Orders: (i) authorizing the Debtors to obtain postpetition financing and enter into the DIP Facility on an interim basis, on the terms set forth in the Interim Order, (ii) authorizing the Debtors to grant mortgages, security interests, liens, and superpriority claims for the benefit of the DIP Lender in respect of the DIP Obligations, in each case as set forth in the Interim Order, (iii) authorizing the Debtors to utilize Cash Collateral, (iv) authorizing the Debtors to provide the Adequate Protection, (v) modifying the automatic stay pursuant to Bankruptcy Code section 362, (vi) authorizing the Debtors to fund the Carve-Out, (vii) in accordance with Bankruptcy Rule 4001(c)(2), scheduling the Final Hearing and approving notice with respect thereto, (viii) granting the relief requested herein on a final basis, and (ix) granting such other and further relief as may be appropriate.

Dated: November 14, 2019
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com
      jenner@lrclaw.com

*Proposed Counsel for the Debtors*
*and Debtors-In-Possession*