## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HRI HOLDING CORP., *et al.*[1] | Case No. 19-12415 (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH A TRANSACTION BY PUBLIC AUCTION; (B) SCHEDULING A HEARING TO CONSIDER THE TRANSACTION; (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (D) APPROVING CONTRACT PROCEDURES; AND (E) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or

"Sellers") by and through their proposed undersigned counsel, hereby submit this motion (the

"Motion") for entry of an order substantially in the form annexed hereto (the "Bidding

Procedures Order"): (a) approving the procedures in connection with the solicitation and

acceptance of higher and better bids (the "Bidding Procedures") substantially in the form

annexed as **Exhibit 1** to the Bidding Procedures Order, including the Breakup Fee and Expense

Reimbursement as defined and set forth in the asset purchase agreement (the "Agreement")[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HRI Holding Corp. (4677), Houlihan's Restaurants, Inc. (8489), HDJG Corp. (3479), Red Steer, Inc. (2214), Sam Wilson's/Kansas, Inc. (5739), Darryl's of St. Louis County, Inc. (7177), Darryl's of Overland Park, Inc. (3015), Houlihan's of Ohio, Inc. (6410), HRI O'Fallon, Inc. (4539), Algonquin Houlihan's Restaurant, L.L.C. (0449), Geneva Houlihan's Restaurant, L.L.C. (3156), Hanley Station Houlihan's Restaurant, LLC (4948), Houlihan's Texas Holdings, Inc. (5485), Houlihan's Restaurants of Texas, Inc. (4948), JGIL Mill OP LLC (0741), JGIL Millburn, LLC (6071), JGIL Milburn Op LLC (N/A), JGIL, LLC (5485), JGIL Holding Corp. (N/A), JGIL Omaha, LLC (5485), HOP NJ NY, LLC (1106), HOP Farmingdale LLC (7273), HOP Cherry Hill LLC (5012), HOP Paramus LLC (5154), HOP Lawrenceville LLC (5239), HOP Brick LLC (4416), HOP Secaucus LLC (5946), HOP Heights LLC (6017), HOP Bayonne LLC (7185), HOP Fairfield LLC (8068), HOP Ramsey LLC (8657), HOP Bridgewater LLC (1005), HOP Parsippany LLC (1520), HOP Westbury LLC (2352), HOP Weehawken LLC (2571), HOP New Brunswick LLC (2637), HOP Holmdel LLC (2638), HOP Woodbridge LLC (8965), and Houlihan's of Chesterfield, Inc. (5073). The Debtors' corporate headquarters and the mailing address is 8700 State Line Road, Suite 100, Leawood, Kansas 66206.

[2] A copy of the Agreement is attached as Exhibit A to the Sale Motion (defined below) filed contemporaneously herewith and incorporated herein by reference. Except where otherwise indicated, capitalized terms used but not

among the Debtors and Landry's, LLC (together with its permitted successors, assigns and designees, the "Stalking Horse Bidder") with respect to the proposed sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets"); (b) scheduling a hearing for the approval of the Sale (the "Sale Hearing") and setting objection deadlines with respect to the Sale; (c) approving the form and manner of notice of the Sale and related auction (the "Auction") for the Purchased Assets, substantially in the form annexed as **Exhibit 3** to the Bidding Procedures Order (the "Sale Notice"); (d) establishing procedures to determine Cure Costs and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases; and (e) granting related relief.    In support of the Motion, the Debtors rely on the *Declaration of Matthew R. Manning in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and state as follows:

**JURISDICTION AND VENUE**

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

2.    The statutory predicates for the relief requested herein are (i) sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (as amended or modified, the

---

defined in this Motion have the meanings ascribed to them in the Agreement, the Bidding Procedures, the First Day Declaration (defined below), or the Sale Motion, as applicable.

[3] Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors hereby confirm their consent to entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

"Bankruptcy Code") and (ii) rules 2002, 6003, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court.

4.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108.  As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

5.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in detail in the First Day Declaration filed contemporaneously with this Motion and incorporated herein by reference.

6.      Also filed contemporaneously herewith is the *Motion of the Debtors for Entry of an Order (i) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (ii) Authorizing the Sale of Assets Free and Clear of All Liens, (iii) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases, and (iv) Granting Related Relief* (the "Sale Motion"), which is incorporated herein by reference.

## A.      The Proposed Sale

7.      As described in more detail in the First Day Declaration and the Sale Motion, the Debtors, in the exercise of their reasonable business judgment, have determined that the most

effective way to maximize the value of the Debtors' estates for the benefit of their constituents was to seek bankruptcy protection and to sell their businesses and assets through a Sale pursuant to Bankruptcy Code section 363. The sale is supported by the Lenders, who do not object to the use of their cash collateral and are lending the Debtors additional amounts under the DIP Facility. In order to satisfy the requirements of the DIP Facility and maintain the support of the Lenders, customers and vendors, and maintain the Debtors' employee base, it is in the best interests of the Debtors and their estates to move expeditiously with a sale process, as discussed herein.

**B.      Marketing of the Debtors' Assets and Selection of the Stalking Horse Bidder**

8.      In June 2019, the Debtors retained Piper Jaffray & Co. ("Piper Jaffray") to evaluate the Debtors' operations and present strategic alternatives to their board of directors. After analyzing their strategic alternatives, the Debtors tasked Piper Jaffray with marketing their assets. Piper Jaffray has prepared extensive marketing materials and began marketing the Debtors' assets in August 2019. After receiving and analyzing various proposals, the Debtors selected the Stalking Horse Bidder in connection with a sale transaction subject to higher or otherwise better bids.

9.      Piper Jaffray continues to market the Debtors' assets postpetition. The Debtors expect that Piper Jaffray's marketing process may result in competing bids being submitted by the proposed December 16, 2019 Bid Deadline. The Debtors believe that, based on consultations with Piper Jaffray, the marketing period, which will have spanned approximately fourteen (14) weeks prepetition and five (5) weeks during these Chapter 11 Cases, is a reasonable and sufficient period to solicit bids on the Debtors' assets given the current market. The Debtors believe that the marketing efforts will be sufficient to ensure the highest or otherwise best offer,

particularly in light of the Debtors' limited financing options and ongoing cash needs.  Further, the Debtors believe that a delayed process likely would lead to the deterioration of the operating performance of their businesses and the value of their assets.

10.     The Debtors also believe that, based on consultations with Piper Jaffray, the Bidding Procedures negotiated with the Stalking Horse Bidder will solicit the highest or otherwise best offer for the Debtors' assets under the circumstances of these Chapter 11 Cases.

**C.     Proposed Bidding Procedures**

11.     The Debtors seek to conduct an open and transparent sale process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Agreement, for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, encumbrances, and interests with such liens, claims, encumbrances, and interests attaching to the sale proceeds.

12.     The Bidding Procedures (as summarized below) were developed consistent with the Debtors' need to proceed with an expedited sale process to preserve the going-concern value of the Debtors' assets and the objective of promoting active bidding that will result in the highest or otherwise best offer for the Purchased Assets.  Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close the Sale.

13.     The following paragraphs in this section summarize key provisions of the Bidding Procedures, and are qualified in their entirety by reference to the actual Bidding Procedures.

     A.     The Termination Fee.  Unless the Stalking Horse Bidder is the Backup Bidder, upon the approval of a sale of all or substantially all of the Purchased Assets to any third party (other than the Stalking Horse Bidder) (an "Alternative Transaction"), in consideration for the Stalking Horse Bidder having expended

considerable time and expense in connection with the Agreement and the negotiation thereof and the identification and quantification of assets of the Debtors, the Debtors are required to pay the Stalking Horse Bidder the Breakup Fee in an amount equal to (i) $1.2 million, *plus* (ii) up to $300,000 of the actual, reasonable and documented expenses of the Stalking Horse Bidder incurred in connection with the negotiation, execution and preparation for the consummation of the transactions contemplated by the Agreement (such Expense Reimbursement, together with the Breakup Fee, the "<u>Termination Fee</u>") by wire transfer of immediately available funds to the account specified by the Stalking Horse Bidder to the Debtors in writing. The Termination Fee shall be paid three (3) Business Days following closing of an Alternative Transaction, and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and the Expense Reimbursement). Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination, or similar fee or payment.

The Termination Fee shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 363, 503(b) and 507(a)(2).

B. <u>Participation Requirements</u>. To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtors to satisfy each of the following conditions:

    1. <u>Confidentiality</u>. To participate in the bidding process and to receive access to due diligence, a party must submit to the Debtors an executed confidentiality agreement in the form and substance satisfactory to the Debtors.

    2. <u>Good Faith Deposit</u>. Each Bid, other than the Agreement submitted by the Stalking Horse Bidder, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the Bid to be held in a segregated account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>"). The Good Faith Deposits of all Qualified Bidders shall be held in one or more segregated accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of one (1) Business Day after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date (defined

below).  If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

3.  <u>Same or Better Terms</u>.  The Bid must be on terms that are substantially the same or better than the terms of the Agreement, as determined by the Debtors (in consultation with[the Lenders) and the Bid must identify which assets the Bidder intends to purchase and include executed transaction documents (a "<u>Competing Transaction</u>").  A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder.  A Bid will not be considered as qualified for the Auction if (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Stalking Horse Bidder as the stalking horse bidder such as the Termination Fee); (ii) such Bid is not received by the Debtors in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Good Faith Deposit has been made.

4.  <u>Corporate Authority</u>.   The Bid must include written evidence reasonably acceptable to the Debtors (in consultation with the Lenders) demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction.

5.  <u>Proof of Financial Ability to Perform</u>.  The Bid must include written evidence that the Debtors reasonably conclude (in consultation with the Lenders) demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction.

6.  <u>Contingencies</u>.  A Bid may not (i) contain representations and warranties, covenants, termination rights, financing, due diligence contingencies other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Stalking Horse Bidder as the stalking horse bidder, such as the Termination Fee) or (ii) be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified

representations and warranties at the Closing.

7. <u>Irrevocable</u>. A Bid must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid, such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

8. <u>Amount of Bid</u>. Each Bid must be for all of the Purchased Assets and shall clearly show the amount of the purchase price. In addition, a Bid (a) must propose a purchase price equal to or greater than the aggregate of the sum of (i) the value of the Bid set forth in the Agreement executed by the Stalking Horse Bidder, as determined by the Debtor (in consultation with the Lenders); (ii) the dollar value of the Termination Fee in cash, and (iii) $250,000 (the initial overbid amount), in cash and (b) must obligate the Bidder to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including all Assumed Liabilities.

9. <u>Adequate Assurance of Future Performance</u>. Each Bid shall be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), including (i) information about the Bidder's financial condition, such as federal tax returns for two (2) years, a current financial statement or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment, in consultation with the Lenders) that the Bidder has the financial capacity to consummate the proposed Competing Transaction, (iii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Competing Transaction, and (v) such additional information regarding the Bidder as the Bidder may elect to include. By submitting a Bid, Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected landlord and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid.

10. <u>Affirmative Statement</u>. Each Bid shall be accompanied by an affirmative statement (i) it has and will continue to comply with these Bidding Procedures; (ii) its bid does not entitle such Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement; and (iii) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Assets.

C. <u>Bid Deadline</u>. Regardless of when a party qualifies as a Preliminarily Interested Investor, the following parties must receive a Bid in writing, on or before

December 16, 2019 at 4:00 p.m. (Prevailing Eastern Time) or such earlier date as may be agreed to by the Debtors (the "Bid Deadline"): (i) the Debtors, 8700 State Line Road, Suite 100, Leawood, Kansas 66206 (Attn: Michael Archer and Cindy Parres); (ii) counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Adam G. Landis and Kimberly A. Brown), landis@lrclaw.com and brown@lrclaw.com, and (iii) investment banker to the Debtors, Piper Jaffray & Co., 2321 Rosecrans Avenue, Suite 3200, El Segundo, California 90245 (Attn: Teri Stratton), teri.l.stratton@pjc.com; (iv) counsel to the Lenders, Katten Muchin Rosenman LLP, 515 South Flower Street, Suite 1000, Los Angeles, California 90071-2212 (Attn: William B. Freeman), bill.freeman@katten.com and 575 Madison Avenue, New York, New York 10022-2585 (Attn: Karen B. Dine), karen.dine@katten.com.

D. Qualified Bid. The Debtors will review each Bid received from a Bidder to determine, in their sole discretion (in consultation with the Lenders), whether it meets the requirements set forth above. A Bid received from a Bidder before the Bid Deadline that meets the above requirements, as determined by the Debtors (in consultation with the Lenders), shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder." The Debtors shall inform Bidders whether or not their Bids have been designated as Qualified Bids no later than twenty-four (24) hours after such Bids are received and shall contemporaneously inform the Stalking Horse Bidder of all Bids that the Debtors consider to be a Qualified Bid. Notwithstanding anything herein to the contrary, the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and the Stalking Horse Bidder is a Qualified Bidder for each phase of the Auction.

E. Auction. If one or more Qualified Bids (other than the Agreement submitted by the Stalking Horse Bidder) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid. If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Stalking Horse Bidder shall be deemed to be the Successful Bidder. Only Qualified Bidders may participate in the Auction. Prior to the Auction, the Debtors shall provide copies of all Qualified Bids to all Qualified Bidders, including the Stalking Horse Bidder.

The Auction shall take place on December 18, 2019 at 10:00 a.m. (prevailing Eastern Time) at the offices of Landis Rath & Cobb LLP, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with the Bidding Procedures.

Prior to the Auction, the Debtors will share with all Qualified Bidders, including the Stalking Horse Bidder, the highest or otherwise best bid received at the Bid Deadline (each, a "Baseline Bid"). Qualified Bidders will be permitted to revise, increase and/or enhance their bids at the Auction based upon the terms of the Baseline Bid. All Qualified Bidders will have the right to make additional modifications to their Qualified Bid or Agreement, consistent with the Bidding

Procedures, as applicable, at the Auction.

1. <u>The Debtors Shall Conduct the Auction</u>.   The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall announce which Qualified Bid(s) is/are deemed to be the highest or otherwise best (each Qualified Bid an "<u>Auction Baseline Bid</u>").  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Debtors' assets.

   Only the Debtors, the Lenders, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction.

2. <u>Terms of Overbids.</u>  An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of an Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

   i. <u>Minimum Overbid Increment</u>.  Any Overbid after the Auction Baseline Bid shall be made in increments valued at not less than $100,000 as determined by the Debtors (in consultation with the Lenders).  Additional consideration in excess of the amount set forth in an Auction Baseline Bid may include cash and/or noncash consideration.  For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Termination Fee.

   ii. <u>Remaining Terms Are the Same as for Qualified Bids</u>. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

3. <u>Backup Bidder</u>.  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of its business judgment (in consultation with the Lenders) will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the date of the Sale Hearing

(the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder (defined herein), the Debtors may designate (in consultation with the Lenders) the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The deposit of the Backup Bidder shall be held by the Debtors until the earlier of one (1) Business Day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

F.   Additional & Modified Procedures. The Debtors may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (e.g., limitations in the amount of time to make subsequent Overbids, changes in minimum overbid increments, etc.) for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures or the Agreement.

G.   Closing the Auction. The Auction shall continue until the Debtors determine in their reasonable business judgment (in consultation with the Lenders) that there is a highest or otherwise best Qualified Bid at the Auction for all of the Purchased Assets (each a "Successful Bid" and each Bidder submitting such Successful Bid, a "Successful Bidder"). The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid. Within twenty-four (24) hours following conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket identifying (with specificity) the Successful Bidder for the Purchased Assets and any applicable Backup Bidders. The Debtors shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

H.   Sale Hearing. The Debtors will seek a sale hearing (the "Sale Hearing") on December 20, 2019. Objections, if any, to the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Agreement must be in writing and filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on December 13, 2019 and be served such that they are actually received by: (i) the Debtors, 8700 State Line Road, Suite 100, Leawood, Kansas 66206 (Attn: Michael Archer and Cindy Parres); (ii) counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn:

Adam G. Landis and Kimberly A. Brown), landis@lrclaw.com and brown@lrclaw.com; (iii) investment banker to the Debtors, Piper Jaffray & Co., 2321 Rosecrans Avenue, Suite 3200, El Segundo, California 90245 (Attn: Teri Stratton), teri.l.stratton@pjc.com; (iv) counsel for the Stalking Horse Bidder, Hunton Andrews Kurth, LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002 (Attn: Mark Arnold and Mark Young), markarnold@huntonak.com and markyoung@huntonak.com and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Noman L. Pernick), npernick@coleschotz.com; (v) counsel to the Lenders, Katten Muchin Rosenman LLP, 515 South Flower Street, Suite 1000, Los Angeles, California 90071-2212 (Attn: William B. Freeman) and 575 Madison Avenue, New York, New York 10022-2585 (Attn: Karen B. Dine), karen.dine@katten.com; (vi) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy); and (vii) counsel to any statutory committee appointed in the Chapter 11 Cases.

14.     Pursuant to Local Rule 6004-1: (i) each bidder participating at the Auction will be required to make a Non-Collusion Representation; (ii) the Auction will be conducted openly and may be attended by the Debtors, their professionals, any statutory committee, and its professionals and the Auction Participants.  Any creditor wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, Debtors' counsel at the address and contact information listed below, Qualified Bidders and their professionals, and creditors and their respective counsel, financial advisors, and/or other authorized representatives as set forth in the Bidding Procedures; (iii) the only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder, including the Stalking Horse Bidder; and (iv) the Auction will be transcribed.  The Bidding Procedures are typical for asset sales of this size and nature and require a deposit from Qualified Bidders, other than the Stalking Horse Bidder.

15.     Other than expressly set forth in the Bidding Procedures, the Debtors (in consultation with the Lenders) reserve the right to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal;

(d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) extend the deadlines set forth herein; and (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice or by filing a notice on the docket.

16.     The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse Bidder's bid is a Qualified Bid.

**D.     The Termination Fee**

17.     The Stalking Horse Bidder has requested bid protections consisting of the Breakup Fee in the amount of $1.2 million and the Expense Reimbursement of up to $300,000 of actual reasonable and documented out-of-pocket costs and expenses in connection with the Sale payable to the Stalking Horse Bidder upon the terms and conditions set forth in Section 7.4(c)(i) of the Agreement to partially defray the substantial out-of-pocket costs the Stalking Horse Bidder has and is expected to incur in this process.  The Termination Fee is warranted here in consideration of the Stalking Horse Bidder's substantial expenditure of time, energy and resources, and the benefits to the Debtors' estate of securing a "stalking horse" or guaranteed minimum bid and setting a floor price at the Auction.  Pursuant to Section 7.4(c)(i), if the Agreement is terminated as a result of the Debtors closing an Alternative Transaction, the Termination Fee shall be paid by wire transfer within three (3) Business Days of the closing of such Alternative Transaction.

**E.     Notice of Auction and Sale**

18.     The Debtors seek to have the Auction commence on December 18, 2019 – thirty-five (35) days from the Petition Date.  Within one Business Day of the entry of the Bidding

Procedures Order, the Debtors will serve by first class mail, copies of: (i) the Bidding Procedures Order and (ii) the Sale Notice upon the following entities: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the Stalking Horse Bidder; (d) the Lenders; (e) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (g) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Motion, which shall include the attorneys general for the State of Delaware and for each state in which the Debtors operate a business; (h) all counterparties to any executory contract or unexpired lease of the Debtors; and (i) all potential bidders previously identified or otherwise known to the Debtors (collectively, the "Sale Notice Parties").

19.      The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served on: (i) the Debtors, 8700 State Line Road, Suite 100, Leawood, Kansas 66206 (Attn: Michael Archer and Cindy Parres); (ii) counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Adam G. Landis, Esq. and Kimberly A. Brown, Esq.); (iii) investment banker to the Debtors, Piper Jaffray & Co., 2321 Rosecrans Avenue, Suite 3200, El Segundo, California 90245 (Attn: Teri Stratton); (iv) counsel for the Stalking Horse

Bidder, Hunton Andrews Kurth, LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002 (Attn: Mark Arnold and Mark Young) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Noman L. Pernick); (v) counsel to the Lenders, Katten Muchin Rosenman LLP, 515 South Flower Street, Suite 1000, Los Angeles, California 90071-2212 (Attn: William B. Freeman) and 575 Madison Avenue, New York, New York 10022-2585 (Attn: Karen B. Dine); (vi) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy); and (vii) counsel to any statutory committee, if any, in accordance with Local Rule 2002-1(b) on or before 4:00 p.m. (prevailing Eastern Time) on December 13, 2019 (the "Sale Objection Deadline").

**F.     Provisions Relating to Executory Contracts and Unexpired Leases, Including Determination of Cure Costs and Deadlines for Objection to Assumption and Assignment of All Contracts**

20.     Given the number of executory contracts and unexpired leases to which the Debtors are party, the Debtors seek to establish (a) procedures for determining the Cure Costs and (b) the deadline for objections to the Cure Costs and/or the proposed assumption and assignment of executory contracts and unexpired leases (collectively, the "Contract Procedures").

21.     Pursuant to the Agreement, the Debtors will provide the Stalking Horse Bidder a schedule (such schedule is referred to herein as the "Contracts Schedule") setting forth (x) each Contract, Lease or Real Property Lease to which any Seller is a party or by which any Seller is bound and that is used in or related to the businesses or any of the Purchased Assets, (y) all Cure Costs (if any) for each such Contract or Real Property Leases and (z) a general description of each such Contract and Real Property Lease.

22.     On or before one (1) Business Day after the entry of the Bidding Procedures Order, the Debtors shall serve by first class mail or hand delivery the Contract Notice, substantially in the form attached as **Exhibit 4** to the Bidding Procedures Order, on all non-Debtor parties to the Contracts Schedule.  The Contract Notice shall identify the Contracts Schedule and provide the Cure Costs that the Debtors believe must be paid to cure all prepetition defaults under such Contracts and Real Property Lease.

23.     Any objection to the Cure Cost or to the assumption and assignment to the Stalking Horse Bidder, including with respect to adequate assurance of future performance of the Stalking Horse Bidder (collectively, a "Contract Objection"), must be filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on December 13, 2019 (the "Contract Objection Deadline"), and served, so as to be received the same day as the objection is filed, on (i) the Debtors, 8700 State Line Road, Suite 100, Leawood, Kansas 66206 (Attn: Michael Archer and Cindy Parres); (ii) counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware  19801 (Attn: Adam G. Landis and Kimberly A. Brown); (iii) investment banker to the Debtors, Piper Jaffray & Co., 2321 Rosecrans Avenue, Suite 3200, El Segundo, California 90245 (Attn: Teri Stratton); (iv) counsel for the Stalking Horse Bidder, Hunton Andrews Kurth, LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002 (Attn: Mark Arnold and Mark Young) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Noman L. Pernick);  (v) counsel to the Lenders, Katten Muchin Rosenman LLP, 515 South Flower Street, Suite 1000, Los Angeles, California 90071-2212 (Attn: William B. Freeman) and 575 Madison Avenue, New York, New York 10022-2585 (Attn: Karen B. Dine); (vi) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy); and

(vii) counsel to any statutory committee appointed in these Chapter 11 Cases.

24.    To facilitate a prompt resolution of (i) disputes relating to the Cure Costs and (ii) any other objections relating to the assumption and assignment of the Contracts or Real Property Lease, the Debtors propose the following procedures:

- Any Contract Objection must state the basis for such objection and state with specificity what Cure Cost the party to the Contract or Real Property Lease believes is required (in all cases with appropriate documentation in support thereof). If no Contract Objection is timely received, the Cure Cost set forth in the Contract Notice shall be controlling, notwithstanding anything to the contrary in the Contract or Real Property Lease or other documents as of the date of the Contract Notice. The Contract Notice shall also provide that the Contract Objection to any Cure Cost or assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors. If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment (solely on the grounds of adequate assurance of future performance) shall be extended to the Sale Hearing, provided, however, that the deadline to object to the Cure Cost shall not be extended.

- Unless a non-Debtor party to any Contract or Real Property Lease files an objection to the Cure Cost by the applicable objection deadline, then such counterparty shall be:

   (a) forever barred from objecting to the Cure Cost and

   (b) forever barred and estopped from asserting or claiming any Cure Cost, other than the Cure Cost on the schedule of the Contract Notice, against the Debtors, the Stalking Horse Bidder, or any Successful Bidder or any other assignee of the relevant contract or lease.

- Unless a non-Debtor party to any Contract or Real Property Lease files a timely objection to the assumption and assignment of the contract to the Stalking Horse Bidder or the other Successful Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Successful Bidder.

*Designation by the Stalking Horse Bidder or other Qualified Bidder*

25.    No later than one (1) Business Day prior to the start of the Auction, the Stalking Horse Bidder shall designate each Contract or Real Property Lease on the Contracts Schedule as

"Transferred," "Rejected," or "Designation Rights Asset,"[4] by delivering written notice to the Debtors.

26.　　Each Qualified Bidder, other than the Stalking Horse Bidder, shall, by delivering written notice to the Debtors by the Bid Deadline, designate each Contract or Real Property Lease on the Contracts Schedule it wishes to be an Assigned Contract.

27.　　Immediately prior to the Sale Hearing, the Debtors shall file the list of Assigned Contracts as of such date.

## RELIEF REQUESTED

28.　　By this Motion, the Debtors seek entry of the Bidding Procedures Order (i) approving the Bidding Procedures in connection with the solicitation and acceptance of higher and better bids, including the Termination Fee, with respect to the Sale of the Purchased Assets, (ii) scheduling the Sale Hearing for December 20, 2019, and setting objection deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Sale and related Auction, (iv) establishing procedures to determine Cure Costs and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases, and (v) granting related relief.

## BASIS FOR RELIEF

I.　　**Approval of the Bidding Procedures Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

　　　　(1)　　*The Bidding Procedures Are Appropriate under the Circumstances*

29.　　Maximization of proceeds received by the estate is one of the dominant goals of

---

[4] Pursuant to section 7.5 of the Agreement, the Stalking Horse Bidder has the right, exercisable until one (1) Business Day prior to the Auction, to designate, in writing, certain contracts, agreements and leases, if any, as "Designation Rights Assets."　On or before fifteen (15) days after the Closing (the "Contract Designation Deadline"), the Stalking Horse Bidder must inform the Debtors whether any Contract or Real Property Lease should either be included in or excluded from the definition of Assigned Contracts.

any proposed sale of estate property. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"). In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process. *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

30.     The Debtors believe that the Bidding Procedures are designed to maximize the value received for the Purchased Assets and prevent any chilling of potential bids by establishing a transparent, competitive and fair bidding process. The process set forth in the Bidding Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence. The Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price by subjecting the value of the Purchased Assets to market testing and permitting prospective Buyers to bid on the Purchased Assets. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable and that the proposed Bidding Procedures will not chill bidding by any Potential Bidders.

31.     Procedures to dispose of assets, similar to the proposed Bidding Procedures have been approved in other large, complex chapter 11 cases in this District. *See, e.g., In re*

*EdgeMarc Energy Holdings, LLC*, Case No. 19-11104 (BLS) (Bankr. D. Del. June 21, 2019); *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics, Inc.*, Case No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings, Inc.*, Case No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *In re Seastar Holdings, Inc.*, Case No. 18-10039 (CSS) (Bankr. D. Del. Jan. 29, 2018); *In re Peekay Acquisition, LLC*, Case No. 17-11722 (BLS) (Bankr. D. Del. Sep. 7, 2017); In *re Jumio, Inc.*, Case No. 16-10682 (BLS) (Bankr. D. Del. Apr. 21, 2016); *In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Oct. 23, 2015); *In re Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *In re iGPS Co. LLC*, Case No. 13-11459 (KG) (Bankr. D. Del. July 31, 2013); Tri-*Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012).

32.     In sum, the Debtors believe that the proposed Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best or otherwise highest offer for the Purchased Assets. Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

*(2)     The Overbid Protections Are Appropriate Under the Circumstances*

33.     The Minimum Overbid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize value while limiting the chilling effect in the marketing process. This provision also is consistent with the overbid increments previously approved by courts in this District. *See, e.g., In re Things Remembered, Inc.*, Case No. 19-19234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics, Inc.*, Case No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings, Inc.*, Case No. 18-10894 (MFW)

(Bankr. D. Del. May 7, 2018); *In re Seastar Holdings, Inc.*, Case No. 18-10039 (CSS) (Bankr. D. Del. Jan. 29, 2018); *In re Peekay Acquisition, LLC*, Case No. 17-11722 (BLS) (Bankr. D. Del. Sep. 7, 2017); *Jumio, Inc.*, Case No. 16-10682 (BLS) (Bankr. D. Del. Apr. 21, 2016); *Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *Tri-Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012).

> (3)    *The Termination Fee, if Approved by the Court, Is an Actual and Necessary Cost of Preserving the Debtors' Estates*

34.    Bid incentives such as the Termination Fee encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  The Debtors submit that approval of the Termination Fee is justified by the facts and circumstances of these Chapter 11 Cases, whether considered under the business judgment rule or as an administrative expense of the estates.

35.    Moreover, the Termination Fee is a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Agreement.  The Stalking Horse Bidder has put forth considerable time and resources to negotiate the Agreement, which will serve as a floor price at the Auction and, regardless of whether other Qualified Bids are received, will benefit the Debtors' estates.  The Debtors believe that the Termination Fee is fair and reasonable in view of (a) the analysis and negotiation undertaken by the Stalking Horse Bidder in connection with the transaction and (b) the fact that, if the Termination Fee is triggered, the Stalking Horse Bidder's efforts will have influenced the chances that the Debtors will receive the highest or otherwise best offer for the Purchased Assets to the benefit of all of the Debtors' stakeholders.

36.    Approval of the Termination Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that "the determination whether bidding incentives are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of [these fees] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535.  In *O'Brien*, the Third Circuit identified two instances in which such a benefit to the estate may be found.  First, a benefit may be found if the bidding incentive promotes a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

37.    In recognition of the expenditure of time, energy and resources as well as the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid and setting a floor price at the Auction, promoting additional competitive bidding and by increasing the likelihood that the ultimate sale price will reflect the true value of the Purchased Assets, the Debtors submit that approval of the Termination Fee is warranted for the Stalking Horse Bidder.  The Debtors' ability to offer the Termination Fee enables the Debtors to ensure the sale of the Purchased Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of a greater return to the estates.  Moreover,

the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressures.

38.     The Debtors and the Stalking Horse Bidder each have acted in good faith throughout this process.  The amount of the Breakup Fee, $1.2 million, and up to $300,000 Expense Reimbursement, represents approximately three percent (3%) of the Purchase Price (exclusive of the value of the assumption of the Assumed Liabilities and reimbursed expenses), and is not so high that it would cause any chilling effect on other prospective buyers, and will have no adverse effect on any creditors.  Pursuant to Section 7.4(c)(i) of the Agreement, if the Debtors close on an Alternative Transaction, the Termination Fee shall be paid by wire transfer of immediately available funds three (3) Business Days following closing of such Alternative Transaction – in which case the Stalking Horse Bidder's participation will have necessarily created value for the Debtors' estate in excess of the amount of the Termination Fee.  Absent authorization of the payment of the Termination Fee, the Debtors might lose the opportunity to obtain the highest or otherwise best available offer for the Purchased Assets and the downside protection that will be afforded by the Agreement.

39.     The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible price for the Purchased Assets.  Furthermore, approval of the Bidding Procedures, including the Termination Fee, is required by the Agreement as a condition to the Stalking Horse Bidder's obligation to proceed with the transaction contemplated in the Agreement.  *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

40.     In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Termination Fee. The Debtors' payment of the Termination Fee under the circumstances described herein is (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtors' estates and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder.  Thus, the Debtors request that the Court approve and authorize payment of the Termination Fee pursuant to the terms of the Agreement.

> (4)     *The Proposed Sale Notice, the Proposed Dates for the Sale Objection Deadlines, the Cure Objection Deadline and the Sale Hearing Are Appropriate*

41.     The Debtors submit that the Sale Objection Deadline is reasonable and appropriate under the circumstances.  Pursuant to Local Rule 9006-1(c)(ii), "[w]here a motion is filed and served in accordance with Local Rule 9006-1(c)(i), the deadline for objection(s) shall be no later than seven (7) days before the hearing date."  Del. Bankr. L.R. 9006-1(c)(ii).  As noted above, the proposed December 13, 2019 Sale Hearing is more than twenty-one (21) days from notice of this Motion and the December 13, 2019 Sale Objection Deadline has been scheduled seven (7) days in advance thereof.  As such, the Debtors submit that the proposed Sale Objection Deadline meets the requirements of the Bankruptcy Rules and the Local Rules.

42.     The Debtors also submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitute good and adequate notice of the Bidding Procedures and

the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadline; and (d) the Sale Hearing.  Therefore, the Debtors respectfully request the Court approve the proposed notice procedures.

> *(5)*    *The Contract Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved*

43.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The Debtors respectfully submit that the proposed Contract Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice of the proposed assumption and assignment of the applicable Contract, as well as proposed Cure Costs, if applicable.  Such Contract Parties will then be given an opportunity to object to such notice.  The Contract Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).  Accordingly, the Debtors submit that implementation of the proposed Contract Procedures is appropriate in these Chapter 11 Cases.

44.    The Contract Procedures comport with the requirements of Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved.  The Debtors respectfully submit that the notices required by the Contract Procedures are sufficient to assume and assign the Assumed Contracts because they are reasonably tailored to provide notice and an opportunity to object to the proposed assumption and assignment.  Thus, the Debtors submit that the Contract Procedures should be approved.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

46.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

## NOTICE AND NO PRIOR REQUEST

47.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims as set forth in

the consolidated list filed with the Debtors' petitions; (c) the Lenders; (d) the Stalking Horse Bidder; (e) all applicable federal, state and local taxing and regulatory authorities of the Debtors; (f) all non-Debtor counterparties to the Debtors' Contracts and Real Property Leases; (g) the Debtors' insurance premium financiers; and (h) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

48.    No prior request for the relief sought in this Motion has been made to this or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Bidding Procedures Order in substantially the form attached hereto, (i) approving the Bidding Procedures in connection with the solicitation and acceptance of higher or otherwise better bids, including the Termination Fee, with respect to the Sale of the Purchased Assets, (ii) scheduling the Sale Hearing and setting objection deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Sale and related Auction, (iv) establishing procedures to determine Cure Costs and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases, and (b) granting such other and further relief as is just and proper.

Dated: November 14, 2019
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com
      jenner@lrclaw.com

*Proposed Counsel for the Debtors*
*and Debtors-In-Possession*