## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HRI HOLDING CORP., *et al.*,[1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 19-12415 (MFW)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 12 and 14<br><br>Hearing Date: December 5, 2019 at 2:00 pm (ET)<br>Objection Deadline: December 3, 2019 at 10:00 am (ET)[2] |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTIONS FOR: (I) ENTRY OF A FINAL ORDER AUTHORIZING POSTPETITION FINANCING AND USE OF CASH COLLATERAL; AND (II) ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") of HRI Holding Corp., *et al.*, the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its proposed undersigned counsel, hereby files this omnibus objection (the "Objection") to:

(1) *Motion of the Debtors and Debtors-In-Possession for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders and (C) Utilize Cash Collateral, (II) Providing Adequate Protection to the Pre-Petition Secured Parties, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2* (the "DIP Motion"); and

---

[1] The Debtors in these cases are: HRI Holding Corp., Houlihan's Restaurants, Inc., HDJG Corp., Red Steer, Inc., Sam Wilson's/Kansas, Inc., Darryl's of St. Louis County, Inc., Darryl's of Overland Park, Inc., Houlihan's of Ohio, Inc., HRI O'Fallon, Inc., Algonquin Houlihan's Restaurant, L.L.C., Geneva Houlihan's Restaurant, L.L.C., Hanley Station Houlihan's Restaurant, LLC, Houlihan's Texas Holdings, Inc., Houlihan's Restaurants of Texas, Inc., JGIL Mill OP LLC, JGIL Millburn, LLC, JGIL Milburn Op LLC, JGIL, LLC, JGIL Holding Corp., JGIL Omaha, LLC, HOP NJ NY, LLC, HOP Farmingdale LLC, HOP Cherry Hill LLC, HOP Paramus LLC, HOP Lawrenceville LLC, HOP Brick LLC, HOP Secaucus LLC, HOP Heights LLC, HOP Bayonne LLC, HOP Fairfield LLC, HOP Ramsey LLC, HOP Bridgewater LLC, HOP Parsippany LLC, HOP Westbury LLC, HOP Weehawken LLC, HOP New Brunswick LLC, HOP Holmdel LLC, HOP Woodbridge LLC, and Houlihan's of Chesterfield, Inc.

[2] Extended as to the Committee with the consent of the Debtors.

(2) *Motion of the Debtors for Entry of an Order (A) Approving Bidding Procedures in Connection With a Transaction by Public Auction; (B) Scheduling a Hearing to Consider the Transaction; (C) Approving the Form and Manner of Notice Thereof; (D) Approving Contract Procedures; and (E) Granting Related Relief* (the "<u>Bid Procedures Motion</u>").[3]

In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Bid Procedures Motion seeks approval of an extremely expedited sale process, with bids due in less than two weeks. Having only been formed the Friday before Thanksgiving, the Committee has spent the past week getting up to speed in these cases to assess the sufficiency of the Debtors' marketing effort, and the potential impact on stakeholders from the accelerated timeline. The Committee has concerns regarding this expedited process, but also recognizes the Debtors' liquidity constraints and the potential harm that could result from an extended process. While the Committee is still analyzing the propriety of the timeline, certain dates and deadlines must be established to allow interested parties time to analyze and respond. In particular, the Debtors must immediately disseminate adequate assurance information for the stalking horse bidder, and must serve adequate assurance information for competing bidders within 24 hours of the Bid Deadline to allow landlords time to assess the information and object if necessary.

2. As part of the DIP financing, the lenders are seeking inappropriate advance waivers of sections 506(c) and 552(b). The Committee acknowledges and appreciates the fact that the DIP budget includes payment of 503(b)(9) claims, other priority claims, and stub rent. Such payments, however, are not slated to be made until the final week of the budget. The waivers, however, are effective upon entry of the Final Order, leaving creditors exposed to the

---

[3] Docket Nos. 12 and 14. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion and Bid Procedures Motion.

risk that the amounts are never paid in the event of a default or if the sale is not consummated. To prevent this result, the waivers should be conditioned on payment of the administrative claims which, given the timeline, represents only a minor delay for the lenders. The waivers should further be conditioned on an appropriate budget for all professionals.

3. In addition, there are potentially significant unencumbered assets, including chapter 5 avoidance actions and valuable liquor licenses that are not subject to encumbrance under applicable state law that must be preserved for the benefit of unsecured creditors. The DIP Liens and the adequate protection liens should be limited to safeguard these assets and any adequate protections liens and claims should be limited to the diminution in value as determined by the Court. The Committee and the lenders have agreed that the Final Order will resolve the Committee's issues on these points. Despite this progress, the lenders have not agreed to preserve the doctrine of marshalling and to look to their original collateral before looking to the proceeds of unencumbered assets.

4. The Court should not allow the Debtors to race through a truncated sale process unless the rights of unsecured creditors are preserved. If the Debtors, lenders and Landry's want to enjoy the benefits of the section 363 sale, then the sale and financing must be modified as set forth herein.

## BACKGROUND

### I. General Case Background

5. On November 14, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.  On November 22, 2019, the Office of the United States Trustee for Region 3 appointed a five member Committee consisting of: (i) Brookfield Property REIT, Inc.; (ii) Edward Don & Company; (iii) 1200 Harbor Boulevard, LLC; (iv) ADR Parc, LP; and (v) Washington Prime Group, Inc.[4]

7.  The Committee selected Kelley Drye & Warren LLP as its lead counsel and Klehr Harrison Harvey Branzburg LLP as Delaware counsel. The Committee also selected Alvarez & Marsal North America, LLC to serve as its financial advisor.

## II. The Prepetition Debt And Capital Structure

8.  The Debtors entered into an amended credit facility, dated December 17, 2015 with CIT Bank, N.A. ("CIT"), as the agent and certain other lender parties (together, the "Lenders"), providing for $52.6 million in term, revolving, and delayed-draw term loans.[5]

9.  As of the Petition Date, the Debtors were purportedly indebted to the Lenders in the approximate amount of nearly $47 million, including more than $4.6 million of accrued and unpaid interest and fees.[6] The prepetition debt is purportedly secured by substantially all of the Debtors' assets.[7]

---

[4] *See* Docket No. 78.

[5] See *Declaration of Matthew R. Manning in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Manning Declaration"), ¶ 11. Docket No. 2.

[6] *See* Interim DIP Order, ¶ D(2).

[7] Manning Declaration, ¶ 11.

### III. The Debtors' Restructuring Efforts

10. As of the Petition Date, the Debtors own and operate 47 restaurants in 14 states.[8] Like much of the casual dining sector, the Debtors maintain they have suffered from industry headwinds, a shifting labor market, and unfavorable leases.[9]

11. In May 2019, the Debtors acquired 17 Houlihan's restaurants from A.C.E. Restaurant Group, Inc., the Debtors' largest franchisee at the time, to expand their footprint and refresh certain locations.[10] Liquidity constraints, however, have limited the growth potential and the Debtors' ability to fund operations.[11] The Debtors have not paid interest or debt service since December 2018, resulting in over $4.6 million of unpaid interest as of the Petition Date.[12]

12. In June 2019, the Debtors, the Lenders, and York Capital Management, the Debtors' sponsor, entered into a Forbearance and Sale Support Agreement (the "FSSA"), which required the company to hire an investment banker to commence a sale process.[13] The Debtors retained Piper Jaffray & Co., who began marketing the Debtors' assets in August 2019.[14]

### IV. The Stalking Horse APA And Bidding Procedures

13. The Debtors purportedly evaluated "various proposals" before selecting and entering into an asset purchase agreement (the "APA") with Landry's, LLC ("Landry's") as the stalking horse purchaser.[15] Pursuant to the APA, Landry's will pay $40 million to acquire

---

[8]  *Id.* ¶ 5.
[9]  *Id.*, ¶ 14.
[10] *Id.*, ¶ 14.
[11] *Id.*, ¶ 16.
[12] *Id.*, ¶¶ 12, 16.
[13] *Id.*, ¶ 17.
[14] *Id.*
[15] *Id.*, ¶ 20.

substantially all of the Debtors' assets, plus assume certain liabilities, including cure costs and 503(b)(9) claims.[16]

14.  The Debtors will subject the Landry's bid to higher and better offers through an expedited auction process that affords parties just 15 days between the bid procedures hearing and the sale hearing.[17] The sale timeline is as follows:

| Event | Date |
| --- | --- |
| Bidding Procedures Hearing | December 5, 2019 |
| Sale and Cure Objection Deadline | December 13, 2019 |
| Bid Deadline | December 16, 2019 |
| Auction | December 18, 2019 |
| Sale Hearing | December 20, 2019 |
| Sale Closing Deadline | December 31, 2019 |

15.  In addition to a 10% deposit required for prospective bidders to participate, the Bidding Procedures propose an initial bid increment of $1.75 million, consisting of: (i) a $1.2 million break-up fee and up to $300,000 of expense reimbursement, amounting to 3.75% of the purchase price; and (ii) an initial $250,000 overbid requirement.[18]

## V.  The Proposed DIP Financing

16.  To fund the sale process, CIT and certain of the Lenders (collectively, the "DIP Lenders") agreed to provide up to $5 million in financing, secured by liens against all of the Debtors' assets, including previously unencumbered property (the "DIP Facility").[19] In

---

[16]  Id.

[17]  See Bid Procedures Motion, Exhibit 2.

[18]  Id., ¶ 13(B)(8).

[19]  See Interim DIP Order, Ex. B – DIP Credit Agreement, §§ 1.01, 2.01, 5.22.

exchange for the DIP Lenders' agreement to provide financing: (i) the Debtors will stipulate that the prepetiton debt constitutes legal, valid, binding, and unavoidable obligations of the Debtors;[20] and (ii) the Debtors' estates will waive all rights under sections 506(c) and 552(b) of the Bankrutpcy Code, as well as the equitable remedy of marshaling.[21]

**OBJECTION**

I. <u>Necessary Revisions to the Final DIP Order</u>

17. To obtain postpetition financing under section 364(d) of the Bankruptcy Code, a debtor must prove: (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate.[22] The Court should only approve postpetition financing to the extent it is "in the best interests of the general creditor body."[23]

    A.    <u>The 506(c)/552(b) Waivers Cannot Be Unconditionally Approved</u>

18. Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.[24] This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries.[25] Courts have widely recognized that section 506(c) waivers are not to be

---

[20] *See* Interim Order, VII.E.

[21] *Id.* ¶ IX.A. Following discussions with the DIP Lenders, the post-default carve-out now includes both the Debtors' professionals and the Committee's professionals, and the Committee's investigation budget has been increased to $50,000. *See* Interim Order, ¶¶ V.A.-B.

[22] *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[23] *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

[24] *See* 11 U.S.C. § 506(c).

[25] *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.),* 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.,* 272 B.R. 332, 334 (D. Md. 2000) ("the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs").

granted lightly.[26] Indeed, in this jurisdiction, courts have explicitly provided that the waiver is not permitted without the consent of the committee.[27] Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee or other party-in-interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure.[28]

19. The quid pro quo for conducting the sale of a lender's collateral in bankruptcy is, at a minimum, the establishment of a proper budget that pays the costs associated with such process. Courts in this district have routinely determined that administrative expenses must be accounted for and paid.[29]

20. The detailed DIP Budget provided to the Committee projects paying section 503(b)(9) claims, other priority claims, and stub rent in the final week of the budget period. The advance 506(c) and 552(b) waivers, however, will be granted upon entry of the Final Order, but if the sale process fails and the DIP Facility terminates, the budgeted amounts will never be paid. To avoid this inequitable result, and assuming the Committee can verify the budgeted amounts, the Final Order should condition the 506(c) and 552(b) waivers on the payment of such amounts.

---

[26] *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest and authorizing the surcharge of a secured lender's collateral where reasonable and appropriate).

[27] *See In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (PJW), Hr'g Tr. (Docket No. 346) at 21 (Bankr. D. Del. March 20, 2007) (noting that without the committee's prior approval, the 506(c) waiver may not be approved). Excerpts from the transcript are attached hereto as Exhibit A.

[28] *See* 11 U.S.C. § 552(b).

[29] *See In re Townsends, Inc.*, et al., Case No. 10-14092 (Bankr. D. Del. January 21, 2011); Hr'g. Tr. at 23:25-24:22, an excerpt of which is attached hereto as Exhibit B (Judge Sontchi required a revised budget that included sufficient funds to pay 503(b)(9) claims, noting that "if it appears that the case is administratively insolvent, I would be inclined to…either convert or dismiss the case…."); *see also In re NEC Holdings Corp.*, et al., Case No. 10-11890 (Bankr. D. Del. July 13, 2010); Hr'g. Tr. at 108:1-108:4, an excerpt of which is attached hereto as Exhibit C (Judge Sontchi, sitting for Judge Walsh, stated that he "need[s] some evidence that there's a probability that admin claims are going to get paid in full, including 503(b)(9) claims or [he] won't approve the financing.").

PHIL1 8524002v.1

21. The 506(c) and 552(b) waivers are also improper without an appropriate budget for the Committee's professionals.[30] The Committee's professionals are already addressing: (i) the approval of the DIP Facility; (ii) the Bidding Procedures, including the expedited sale timeline; (iii) the proposed key employee incentive and retention plans; and (iv) various first day motions, and the Committee will play an active role until the closing of any sale and in the assessment of the proper wind down strategy for these cases. The Committee's professionals should be allocated an appropriate budget to carry out its duties on the expedited timeline established by the Debtors.

B. The Equitable Doctrine Of Marshaling Should Be Preserved

22. Marshaling requires a secured creditor to first seek recovery from assets against which other creditors do not have a claim before looking to common assets.[31] It "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."[32] It is well settled that bankruptcy courts can marshal a debtor's assets to effectuate an equitable distribution to creditors.[33]

23. The Committee's right to invoke the doctrine of marshaling against the DIP Lenders must be preserved.[34] As set forth above, the Committee believes there are unencumbered liquor licenses with meaningful value, which may be the only source of value for

---

[30] While the filed DIP Budget did not delineate between the Debtors and Committee's professionals, the Committee now understands that the DIP Budget allocates $1,555,000 for the Debtors' professionals and only $450,000 for the Committee's advisors.

[31] *See In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) ("[Marshaling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit.") (citation omitted); s*ee also In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985) (*citing* 2 J. Story, *Commentaries on Equity* Jurisprudence 230 (1884)).

[32] *See Meyer v. United States*, 375 U.S. 233, 236 (1963).

[33] *See Tampa Chain Co.*, 53 B.R. at 777.

[34] *See In re America's Hobby Center, Inc.*, 223 B.R. 275 (Bankr. S.D.N.Y. 1998) (creditors' committee permitted to seek to assert marshaling defense against secured creditor on behalf of the debtor's estate).

9

unsecured creditors. To the extent the proceeds of such claims are not subject to the liens of the DIP Lenders, the DIP Lenders should not be authorized to look to those assets and their proceeds before looking to their original collateral.

**II.     The Bidding Procedures Must Be Modified to Ensure a Full and Fair Process**

24. The Bidding Procedures require bids to be due by December 16—only 11 days following the December 5 hearing—with an Auction only 2 days later on December 18. The Committee is supportive of a fair marketing and sale process that is designed to maximize value for all of the Debtors' stakeholders. The Committee, however, was formed just over one-week ago on the Friday before Thanksgiving and has not had an opportunity to properly assess the proposed sale process and its impact on the estates.

25. The Committee intends to continue working with the Debtors over the next several days to determine whether it can get comfortable with the truncated timeline. The Committee will raise its issues with the Court at the December 5 hearing if the process or timeline is unreasonable or inappropriate.

26. Even if the Committee determines that sale process is appropriate, there are certain provisions in the Bidding Procedures that must be modified before approval:

- <u>Assets Subject to Bid</u>: The Bidding Procedures should expressly authorize the submission of bids with respect to all or a subset of the assets.[35]

- <u>Timeline</u>: The Bidding Procedures must provide creditors ample time to assess Landry's adequate assurance package and the adequate assurance of prospective bidders. The timeline should be clarified/revised as follows:

---

[35]     Bidding Procedures, p. 3.

| Event | Date |
|---|---|
| Service of Landry's Adequate Assurance | No later than December 5, 2019 |
| Bid Deadline | December 16, 2019 |
| Service of Qualified Bidder's Adequate Assurance Information | Within 24 hours of Bid Deadline |
| Committee's Sale Objection Deadline | December 17, 2019 |
| Adequate Assurance Objection Deadline for Non-Landry's Bids | Up to the Sale Hearing |

- Termination Fee: The Termination Fee should only be paid from the proceeds of an Alternative Transaction. Landry's must submit an invoice detailing the fees and expenses it is seeking reimbursement of, with an opportunity for the Debtors and the Committee to object, prior to payment of the Expense Reimbursement. The Expense Reimbursement should be paid within three days after the expiration of such period.[36]

- Landry's Backup Bidder Status: The Bidding Procedures require the Backup Bidder to keep its bid open for 21 days after the Sale Hearing (*i.e.*, until January 10, 2020) but Landry's is permitted to terminate the APA if the sale has not closed by December 31, even if Landry's is the Backup Bidder. The Debtors may not be incentivized to entertain potentially higher and better bids because they will be left without a Backup Bidder if Landry's is outbid at auction, the overbidder does not close, and Landry's subsequently terminates the APA.[37]

- Consultation Rights: If the DIP Lenders submit a credit bid for some or all of the Debtors' assets, they should not be included as a consultation party. The Committee must be included as a consultation party, including with respect to any modifications to the procedures implemented by the Debtors at the auction.[38]

- Auction Attendance/Notice: The Committee must be permitted to attend the auction and receive notice of all bids. Additionally, creditors that submit a request to the Debtors within three days of the start of the auction should be authorized to attend.[39]

---

[36]    Bidding Procedures, p. 7.

[37]    Bidding Procedures, pp. 5-6.

[38]    Bidding Procedures, p. 6.

[39]    Bidding Procedures, pp. 3, 5.

11

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Bid Procedures Motion and DIP Motion unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
December 3, 2019

**KLEHR HARRISON HARVEY BRANZBURG LLP**

*/s/ Richard M. Beck*
Domenic E. Pacitti (DE Bar No. 3989)
Richard M. Beck (DE Bar No. 3370)
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
Email: dpacitti@klehr.com
rbeck@klehr.com

- and -

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson (admitted *pro hac vice*)
Jason R. Adams (admitted *pro hac vice*)
Lauren S. Schlussel
Maeghan J. McLoughlin (admitted *pro hac vice*)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897
ewilson@kelleydrye.com
jadams@kelleydrye.com
lschlussel@kelleydrye.com
mmcloughlin@kelleydrye.com

*Proposed Counsel to the Official Committee of Unsecured Creditors of HRI Holding Corp., et al.*